**ESTATE of Ben H. COLLINGS, by Bess H. Collings and William Furlong, Executors, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 2662.

United States District Court
W. D. Kentucky, at Louisville.
July 14, 1955.

Chas. I. Dawson, Bullitt, Dawson & Tarrant, Louisville, Ky., for plaintiffs.

H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, Benjamin H. Pester, Sp. Assts. to Atty. Gen., J. Leonard Walker, U. S. Atty., Louisville, Ky., for defendant.

SHELBOURNE, Chief Judge.

This action was filed September 3, 1953, by plaintiffs to recover $10,140.03 in tax, allegedly erroneously assessed and collected from the estate of Ben H. Collings and paid to the Collector of Internal Revenue for Kentucky April 7, 1952, and the further sum of $2,623.04 paid to the Collector May 21, 1952, as interest.

The decedent taxpayer, Ben H. Collings died April 3, 1951, and the year in question is the fiscal year ended September 30, 1947. The assessment of the delinquent tax was made by the Commissioner.

Plaintiffs paid the tax and on January 29, 1953, filed a claim for refund, which, after more than six months after its filing, elicited no response from the Commissioner and this action resulted, seeking the recovery for the aggregate tax and interest in the sum of $12,763.-07, with interest and costs.

The sole question involved is whether the gain realized by the taxpayer from the sale of four saddle mares during the fiscal year ended September 30, 1947, was ordinary income to the taxpayer or was taxable as a long term capital gain.

The case was tried to the Court without a jury, on the 17th day of November 1954. Time was given counsel for preparation of briefs.

The Court makes the following Findings of Fact:

1. Ben H. Collings from 1938 until his death operated a farm near Louisville, in Jefferson County, Kentucky, upon which he conducted the business of breeding, training and selling saddle horses. He maintained a stallion, Colonial Chief, and both mares and geldings.

2. In the spring of 1938, he purchased eight blooded, aged brood mares, four with foals by their side, one three-year old gelding, one two-year old gelding, one yearling gelding, four yearling fillies and two yearling stallions. One of the yearling stallions died of pneumonia after Mr. Collings acquired him and one of the fillies was injured and had to be destroyed.

Colonial Chief, the stallion kept at stud through the years, was a year old when he was acquired.

Mr. and Mrs. Collings also bred and raised Aberdeen-Angus cattle.

3. During the years of World War II, the market for trained saddle horses dropped severely and the taxpayer sold seven of the eight brood mares originally purchased, keeping what he thought was an exceptionally well bred aged mare, American Eve. He retained one young mare from each of the other four older mares and two of American Eve's foals.

In April 1946, Carl Stone was employed on the farm to train the saddle horses and assist Mr. and Mrs. Collings

in the management of the saddle horse enterprise.

At that time, there were on hand the stallion, Colonial Chief, and six mares, Colonial Love, eight years old, Colonial Princess, six years old, Colonial Rhythm, four years old, Colonial Colleen, three years old, Colonial Twilight, two years old and Colonial Sweetheart, one year old.

Shortly after Stone came to the farm, Colonial Sweetheart was sold for $2,000, the proceeds from which sale were reported by the taxpayer as ordinary income. In May 1946, the taxpayer purchased an aged brood mare, Colonial Love, bred her to Colonial Chief and turned her out to pasture.

Colonial Princess, Colonial Rhythm, Colonial Colleen, and Colonial Twilight were all trained rigidly, as their ages permitted, by Stone to develop them for the show ring.

5. In May 1946, Mr. Collings suffered a heart attack and thereafter was able to devote but little time to the saddle horse enterprise, his activities being greatly limited, but with the attention of Mrs. Collings and Stone, the business continued and the four mares developed, with Colonial Princess showing unusual class in the show ring.

In 1947, prior to the end of taxpayer's fiscal year, Colonial Princess was sold for $20,000, Colonial Rhythm for $315, Colonial Colleen for $2,000 and Colonial Twilight for $850, an aggregate of $23,165. The taxpayer reported the proceeds of these sales as sales of capital assets and paid the tax on long term capital gains.

As above stated, the Commissioner disallowed the claim that the mares represented capital assets and assessed the tax on the gain as ordinary income.

6. From time to time during the life of the saddle horse enterprise, the taxpayer had had and trained one or more geldings solely for the purpose of resale as gaited horses.

7. It was shown by testimony of persons experienced and successful in breeding and training saddle horses for profit that it is customary and considered good practice to train mares of good conformation and promising show ring qualities at least up until seven years old or older and that unusually good show mares are often never bred before attaining the age of twelve or fifteen years. A successful show ring career lends prestige to the owner's breeding establishment and creates a market and demand for foals of a dam that has an outstanding, successful show ring career.

Breeding a mare usually results in her loss of conformation and spirit. The general practice is that when a mare is bred to retire her from all training activities and put her on pasture during her eleven months of gestation and until her colt is foaled and weaned. Once a mare is successfully bred, she is rarely ever returned to training for the show ring.

The taxpayer advertised in some of the saddle horse journals, advertising his stable and some of his prize winning saddle horses, but no advertisement is shown to have set any price for any particular horse and Mrs. Collings testified that the advertising was designed primarily to enhance the prestige of the taxpayer's stable as a breeding establishment.

9. The mare Colonial Princess trained and showed successfully and in 1947, at a Horse Show in Frankfort, she was shown in the mare class and won that class. Following that exhibition, the taxpayer was offered $17,500 for her but declined the offer. About two nights later, she was shown in the five-gaited stake class and after she won that, the taxpayer was offered $20,000 for her and accepted the offer.

10. The Court finds as a fact that Colonial Princess, Colonial Rhythm, Colonial Colleen and Colonial Twilight were all held by the taxpayer primarily for the purpose of breeding.

Mares with good blood lines and good prospects as brood mares are trained

for the show ring usually until a minimum of seven years of age before breeding, which enhances the sale value of their progeny and advertises the owner's stables generally. The same would be true for young stallions and Colonial Chief was trained for the ring by the Collings.

The Court makes the following Conclusions of Law:

Prior to its amendment in 1951, Section 117(j) of the Internal Revenue Act, 26 U.S.C.A., read as follows:

"For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than six months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable." 56 Stat. 846, as amended by 58 Stat. 47.

There was added by the 1951 Revenue Act this specific language to the definition of the term "property used in the trade or business".

"Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition." 65 Stat. 501.

█ The statute, as amended in 1951, is applicable to the tax returns involved here for the taxpayer's fiscal year ended September 30, 1947, because the amendment in 1951 contains a provision with respect to livestock making the statute, as amended, retroactive and applicable to all taxable years beginning after December 31, 1941, except that the change in the holding period from six months to twelve months was made applicable only to tax years beginning after December 31, 1950.

The sales in the case at bar being made prior to the enactment of the amendment in 1951 are by the express terms and retroactive provisions of the statute to be considered under section 117(j) (1) as amended in 1951.

In the case of Gotfredson v. Commissioner of Internal Revenue, 6 Cir., 217 F.2d 673, 677, the Court said:

"We agree that the ultimate use of the young animals is evidence of the purpose for which they were held, but that it is not the only test, and that young cattle *could* be held for dairy purposes even though not ultimately so used."

█ Applying that rule to the facts of this case, the sale of the mares involved here is evidence that the purpose for which they were owned and held was sale as opposed to breeding, but that the fact they were sold is not the only test to determine the purpose for which they were held and that they could have been held for breeding though "not ultimately so used."

In the case of Estate of C. A. Smith, 23 T.C. 690, the Tax Court said:

"The legislative history of the 1951 amendment plainly indicates that Congress was concerned over the Commissioner's reluctance to recognize that young animals were capable of being held as breeding stock. And, the phrase 'regardless of age' written into the statute indicates a clear intent to prevent age alone from being used as the criterion. As the Fourth Circuit said, in commenting on the 1951 amendment in the course of affirming our decision in the Fox case [Fox v. C. I. R., 198 F.2d 719], 'The important thing is not the age of the animals but the purpose for which

they are held.' 198 F.2d 722; cf. also McDonald v. Commissioner, 2 Cir., 1954, 214 F.2d 341, reversing 1951, 17 T.C. 210."

■ Necessarily, the statute, even as amended, will continue to present a problem for it is the *primary* purpose for which the livestock is held that determines whether the proceeds of its sale should be taxed as ordinary income or as capital gain. This involves a determination of the *intention* of the taxpayer during the retention of the property.

There is no question from the evidence introduced here but that the Collings had an announced intention of developing the mares in question as brood mares, but in order successfully to develop them for brood mares they undertook, in accordance with the proven custom and best practices of the saddle horse industry, to train for the ring and show the mares, which inevitably would, and certainly did, in the case of Colonial Princess, attract offers to purchase. The unusually high price offered for this particular mare, together with the illness sustained by Ben Collings, are said to have been the cause of the sales in question.

■ Nothing in the proven conduct of the taxpayer is inconsistent with his announced intention of retaining the mares in question and holding them up to the time of their sales *primarily* for breeding purposes.

■ While the assessment of the Commissioner is by statute legally presumptive of the Commissioner's correctness, when the assessment is challenged and evidence introduced, the Court should conclude from the evidence the correctness of the assessment without regard to any statutory presumption. Kentucky Trust Co. v. Glenn, 6 Cir., 217 F.2d 462.

Accordingly, it is concluded that the Commissioner was in error in assessing a delinquent tax on the proceeds of the sales of the four mares and consequently erred in demanding the payment of the deficiency tax. It is also concluded that the decedent's estate is entitled to recover the amount of tax and interest paid, together with interest, as provided by law, from the date of payment.

Counsel for the plaintiff will upon notice to the United States Attorney present a proper judgment in accordance with this conclusion.