ROBERT B. JEWELL AND MARGARET E. JEWELL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 51132. Filed October 26, 1955.

*A. Robert Doll, Esq.*, and *Bernard H. Barnett, Esq.*, for the petitioners.

*John L. Carey, Esq.*, for the respondent.

114

**OPINION.**

BRUCE, *Judge:* The question presented is whether horses foaled on Jewell's farm and sold as yearlings during the taxable years involved were held for breeding purposes and were, therefore, "property used in the trade or business" within the purview of section

117 (j) (1), Internal Revenue Code of 1939.[1]   As all of the horses involved were held more than 6 months, if they were held primarily for breeding purposes as petitioners contend, the gain on their sale is taxable as long-term capital gain.[2]   However, if they were held primarily for sale as respondent contends, the gain is taxable as ordinary income.

The determination of the primary purpose for which the horses were held is a question of fact.  *Estate of C. A. Smith*, 23 T. C. 690 (on appeal C. A. 4) ; *Albert T. Erickson*, 23 T. C. 458.   In order for the horses to be held for breeding or racing it is not necessary that they be old enough to be used for either purpose.  *Collings' Estate* v. *United States*, (W. D., Ky.) 138 F. Supp. 837; *James M. McDonald*, 23 T. C. 1091 (on appeal C. A. 2) ; *Estate of C. A. Smith, supra; McDonald* v. *Commissioner*, (C. A. 2) 214 F. 2d 341.   The determination of the purpose for which the horses were held depends entirely upon the intention of the taxpayer.  *Collings' Estate* v. *United States, supra.*

Respondent points out that Jewell was in the business of selling young standard-bred trotting horses either as weanlings prior to 1943 or as yearlings after 1942, that only 1 out of the 23 colts foaled during the period from 1945 to 1949, inclusive, was retained, and that 19 were sold as yearlings.   He also points to the fact that none of the horses involved were used for breeding or racing which in many cases is evidence that they were held for that purpose.   Cf. *Gotfredson* v. *Commissioner*, (C. A. 6) 217 F. 2d 673.   Upon the basis of these facts he contends that all of the horses in question were held primarily for sale, citing *Walter S. Fox*, 16 T. C. 854, affd. (C. A. 4) 198 F. 2d 719; *Albert T. Erickson, supra.*

Respondent's argument is persuasive, but in our opinion fails to recognize that Jewell was attempting to build up a breeding herd of championship trotting horses, that only a small percentage of the

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or (C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in subsection (a) (1) (C).   Such term also includes timber or coal with respect to which subsection (k) (1) or (2) is applicable and unharvested crops to which paragraph (3) is applicable.   Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition.   Such term does not include poultry.

[2] A 6-month holding period applies to taxable years beginning prior to January 1, 1951.

colts foaled would normally qualify for such a herd, and that of the colts owned solely by Jewell none of those sold qualified for the breeding herd. Under these circumstances all of the animals sold were not necessarily held for sale just because it was known that most of the colts foaled would be sold (*James M. McDonald, supra*) or because the taxpayer's primary business was selling animals similar to those sold (*Estate of C. A. Smith, supra*).

Petitioners contend, on the other hand, that all of the horses involved were held primarily for breeding purposes, citing *James M. McDonald, Estate of C. A. Smith,* and *McDonald v. Commissioner,* all *supra.* They rely principally upon Jewell's testimony that he was attempting to build up the quality of his breeding herd, that all of the colts involved were bred to become members of the breeding herd if they were good enough, and that all were culled because they did not possess the qualities desired in members of the breeding herd.

Neither the cases cited nor the above testimony require the conclusion requested by petitioners. In the first place the *Smith* and *McDonald* cases are distinguishable. Unlike the taxpayer in the *McDonald* cases Jewell's principal business was selling animals—not using animals for dairy or racing purposes. Also, unlike the *McDonald* cases, Jewell did not sell a number of the animals at birth and did not cull or sell an animal as soon as a defect appeared. He retained all of the horses until around November of their yearling year despite the fact that in some instances it became apparent by the time the horse was weaned that it would not be retained. Further, in the *McDonald* cases it was unprofitable to hold the cattle sold; while here, to judge from the profit derived from the 2 horses petitioner purchased as weanlings and sold as yearlings because they did not develop as expected, it was financially rewarding to hold and train the horses until they were yearlings. In the *Smith* case, while the taxpayer was in the business of breeding animals for sale, he had 2 herds, a sale herd and a breeding herd, and the only sales involved were unusual sales of young but fully qualified members of the breeding herd. Here we are concerned with the normal and customary sales in the ordinary course of petitioners' business from an unsegregated herd.

Not only are the cases upon which petitioners rely distinguishable, but the facts to which Jewell testified do not constitute a sufficient basis for holding that all of the horses involved were held primarily for breeding. First, little weight can be attributed to the fact that during the period involved Jewell was attempting to build up, rather than merely to maintain, a high quality breeding herd. The purpose of building up the herd could continue indefinitely as perfection is never possible; and, even if perfection were attained, Jewell's mode of operation would not necessarily change. He would still have to retain at

least as many animals as he retained during the period involved in order to perpetuate the herd. Also, the purpose for which the horses were bred does not determine whether they qualify under section 117 (j) (1). It is the purpose for which they were being held at the time of sale that is controlling. Cf. *Curtis Co.*, 23 T. C. 740 (on appeal C. A. 3) ; *J. C. Bradford*, 22 T. C. 1057 (on appeal C. A. 6). Furthermore, it does not follow from the fact that none of the horses sold were qualified for the breeding herd that all of the horses sold were held for breeding prior to their sale.

The primary fallacy in the arguments of both parties is that they are based upon the proposition that Jewell's general intention with respect to the colts foaled determines the purpose for which all were held. While there is no over-all rule which will apply to all animals or even to any particular type of animal, we think in the instant case each horse was unique and the purpose for which each was held must be determined separately.

We have found as a fact that Jalapa, Jettsam, and Juggernaut were held primarily for breeding purposes. Each was held for breeding purposes for more than 6 months before the defect appeared which caused it to be culled, and each was sold within a reasonable time after the defect appeared. See *James M. McDonald, supra*.[3]

With respect to the other horses involved, we do not think petitioners have proven that they were held primarily for breeding purposes. Kiss 'N Tell, Linda Sue, and Justification were owned jointly by Jewell and another. Jewell owned a one-fourth interest in the first two and a one-half interest in the latter. The first two were sold because Jewell's partner insisted. It was not shown that the partner ever intended that these two horses would be used for breeding purposes. Jewell might have intended to buy them for breeding purposes if it developed they were good enough and he could get them cheap

---

[3] Cf. Regulations 118. Sec. 39.117 (j)–2. *Livestock held for draft, breeding, or dairy purposes.*

(b) The determination whether or not livestock is held by the taxpayer for a draft, breeding, or dairy purpose depends upon all of the facts and circumstances in each particular case. The purpose for which the animal is held is ordinarily shown by the taxpayer's actual use of the animal. *However, a draft, breeding, or dairy purpose may be present in a case where the animal is disposed of within a reasonable time after its intended use for such purpose is prevented by accident, disease, or other circumstance.* An animal held for ultimate sale to customers in the ordinary course of the taxpayer's trade or business may, depending upon the circumstances, be considered held for a draft, breeding, or dairy purpose. An animal is not held by the taxpayer for a draft, breeding, or dairy purpose merely because it is suitable for such purpose or because it is held by the taxpayer for sale to other persons for use by them for such purpose. Furthermore, an animal held by the taxpayer for other purposes is not considered to be held for a draft, breeding, or dairy purpose merely because of a negligible use of the animal for such purpose or because of the use of the animal for such purpose as an ordinary or necessary incident to the purpose for which the animal is held.

(c) These principles may be illustrated by the following examples :

*Example (1)* : An animal intended by the taxpayer for use by him for breeding purposes is discovered to be sterile, and is disposed of within a reasonable time thereafter. This animal was held for breeding purposes. [Emphasis supplied.]

enough. However, that is not the same as holding them for breeding purposes. The latter, Justification, was not only a partnership mare, but by the time she was 4 or 5 months old Jewell knew that her conformation was so bad she could not be used for breeding.

Johnny Vinegar, James VI, and Jereboam were all stallions which were related to a number of Jewell's brood mares and could not be bred to those mares. Also, Jewell used only 1 stallion in his breeding herd. The stallion must be better than the mare, and under the circumstances would have had to be a very outstanding horse before it would have been retained. As none of the three were exceptionally well bred, Jewell knew at the time each was foaled that there was little, if any, chance it would be retained. Also, it was not shown when the various defects which developed in these three horses became apparent. Under the circumstances we cannot find that any of these horses were held for breeding purposes. Cf. *Laflin* v. *United States*, (D. Nebr.) 100 F. Supp. 353, 357.

The remaining horses are Joyous Day and Jocose. Joyous Day began growing at a rapid rate about the time she was weaned and became as big as a draft horse. Jewell knew while she was still young that her conformation was such that she could not be used for breeding purposes. Thereafter she was being held for sale. Jewell decided to sell Jocose when she developed a spavin. There is no evidence in the record as to when this occurred. It may well be that an expert in the breeding and raising of standard-bred or thoroughbred race horses would know the earliest age of a horse at which a defect of this nature would develop and become noticeable. We, however, are compelled to take the record as the parties have made it. Consequently, there is nothing to show that Jocose was not held primarily for sale from the time she was a very young colt until she was nearly 2 years of age. Since it was not shown that either Joyous Day or Jocose was disposed of within a reasonable time after the defects appeared which caused them to be culled, rather than held and trained for a considerable period of time in order to build up their sale price, it is impossible to find that either was being held primarily for breeding purposes at the time she was sold.

*Decision will be entered under Rule 50.*