Anderson Fowler and Genevieve B. Fowler, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 77439.   Filed March 22, 1962.

*Rollin A. Hunter, Esq.*, for the petitioners.
*John J. Hopkins, Esq.*, for the respondent.

OPINION.

TURNER, *Judge:* In case of the sale or exchange of property used in the trade or business of a taxpayer, the general rule, as prescribed by section 1231(a) of the Internal Revenue Code of 1954,[2] is that the gains and losses therefrom shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months, if the recognized gains exceed the recognized losses from such sales or exchanges. If on the other hand such gains do not exceed such losses, the

gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For the purposes of section 1231(a), the term "property used in the trade or business" is defined by section 1231(b).[2] As so defined, the general rule is declared in section 1231(b)(1) to be that property used in the trade or business means "property used in the trade or business, of a character which is subject to the allowance for depreciation * * *, held for more than 6 months," but does not include property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Where, however, the property in question consists of livestock held by the taxpayer "for draft, breeding, or dairy purposes," section 1231(b)(3)[2] specifies a holding period of 12 months if such livestock is to qualify as property used in the trade or business, for the purposes of section 1231(a), instead of a period of 6 months as under the general rule.

That the recognized gains by petitioners from the sale of capital assets during the taxable year exceeded the recognized losses from such sales, is not in question. Neither is there any question as to the amount of the loss sustained by them upon the sale of the race-horse Darubini. The question accordingly is whether or not Darubini was property used by petitioners in their trade or business within the meaning of section 1231. If so, the loss on his sale must be considered as a loss from the sale or exchange of a capital asset, as respondent has determined, and not as a loss from the sale or exchange of property which is not a capital asset, as claimed by petitioners on their return.

---

[2] SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

*        *        *        *        *        *        *

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months * * *, which is not—

*        *        *        *        *        *        *

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *

*        *        *        *        *        *        *

(3) LIVESTOCK.—Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. * * *

We are not confronted in this case, as we have been in most of the decided cases involving the sale of livestock, with the question of whether or not the animals sold had been held primarily for sale in the course of the taxpayers' trade or business. The facts show that in owning and operating Glenelg Stable, the primary and ultimate purpose of petitioners was the racing of horses for profit, namely, for purses at public tracks, and that they acquired some of the horses used in their operations by purchase and some they raised. There is no contention that petitioners were in the business of acquiring or raising horses primarily for sale and petitioners specifically disavow that their business was that of acquiring, raising, or holding horses for sale. In short, the parties appear to be agreed that Darubini was not acquired for resale, but for use in petitioners' business of operating Glenelg Stable and that he was in fact used therein. The point of disagreement is as to the use for which he was acquired and held, within the meaning of the statute, and arises from the fact that under the wording of section 1231(b)(3), livestock held for draft, breeding, or dairy purposes is to be considered as property used in the taxpayer's trade or business and the gains or losses therefrom are to be considered as capital gains or losses under section 1231(a), if such livestock has been held for 12 months or more, whereas, if the livestock was held or used in the trade or business for other than draft, breeding, or dairy purposes, then according to section 1231 (b)(1), the animals sold were property used in the taxpayer's trade or business and the gains or losses from their sale are to be considered as capital gains or losses under section 1231(a), if they had been held for as much as 6 months.

Whether or not the horses owned by petitioners in the course of their operation of Glenelg Stable were acquired by purchase or were raised by them, most, if not all, were trained for racing and most of them were raced. Toquilla, Belle Watling, Triplay, Superupper, Doc Walker, and all of the foals raised by petitioners, except Tamarac and Assemblyman, were never used for any purpose other than racing. Red Abbey and Royal Devon were trained for racing but never raced, Red Abbey because of a bowed tendon and Royal Devon because he showed poorly in training. Both were stallions, but neither was used for breeding purposes while owned by petitioners. Wilhemine, Fiercely, Tamarac, and Assemblyman were used both for racing and for breeding purposes, but Assemblyman is the only one of the four still owned by petitioners. Spangled, Libba, and possibly Queue were used by petitioners only for breeding purposes, and of those, only Queue has been sold. The facts thus show that although the primary purpose of Glenelg Stable is the earning of profits through the racing of horses at public tracks for purses, a part of the operation is the

breeding of racehorses, not for sale, but for training and racing; that most of the horses owned by petitioners have been used for racing only; that some have been used both for racing and breeding, and some for breeding purposes only.

Although all of the horses raised by petitioners, except Assemblyman, and all of the horses purchased, except Spangled and Libba, have been sold, there was no factual basis for question, except as to Darubini, as to the treatment of gains or losses resulting from their sale as capital gains and losses, regardless of the use of the horses, since all had been held for more than 12 months, except Superupper and she had been held for less than 6 months when claimed in January of 1955. Accordingly, except as to Darubini, it had been of no moment, for capital gain and loss purposes, whether any of the horses sold by petitioners in the course of their operations were acquired and held for racing or for breeding purposes, or for both.

As for Darubini, it does make a difference, since there appears to be no question that a horse acquired and held for breeding purposes only would not, under section 1231(b)(3), be property used in a taxpayer's trade or business for the purposes of section 1231(a), if not held for 12 months. Correspondingly there appears to be no question that a horse acquired, held, and used only in the business of racing horses for purses would, under section 1231(b)(1), be property used in the taxpayer's trade or business for the purposes of section 1231(a), if he was so held for a period of 6 months.

The petitioner, in his testimony, would convey the impression that the purpose to race Darubini was merely to prove his racing ability so as to establish him for stud purposes and the fact that in demonstrating his racing ability he would be earning profits for Glenelg in its horseracing operations would, from petitioner's viewpoint, be of no controlling importance. Brady, it seems, was already certain at the time of purchase that Darubini would make a good sire, and expressed great confidence in him as a prospective sire, but at the same time indicated that he was looking forward to Darubini's use as a racehorse, stating that with a little luck, or if Darubini stayed sound, they had bought a good racehorse and that he would run well.

If we understand petitioner's position clearly, it is that to become an established sire of good or fine racehorses, it is essential that a stallion first be a success as a racehorse; that such success as a racehorse means the winning of stake races, and where a stallion is acquired with a view to his subsequent use as a stud, provided he is first successful in winning purses in stake races, he is held for breeding purposes within the meaning of section 1231(b)(3), and is property used in a taxpayer's business under section 1231(a) only if he has been held for 12 months, and that the general definition of property used in the

trade or business, as set forth in section 1231 (b) (1), which requires a holding period of only 6 months, is of no force, even though it was intended that first the horse was to be raced for profit and was to be used for breeding purposes only if he was successful in winning purses as a racehorse, and even though he was in fact used in racing for purses and for no other purpose.

On the facts here, it is our opinion that the statute may not be so construed and applied. We are satisfied that the purchasers of Darubini hoped and felt that they were acquiring a horse which would first make money for them in winning purses in stake races, and at an appropriate time in the future could be used by them to sire other racehorses. It may be noted at this point that Assemblyman had earned approximately $90,000 in purses for the business by the time he was retired to stud and that though he was so retired as a 4-year-old, his retirement at that time was because he was "unable" to race. The facts are definite, we think, that Darubini was acquired and was held and used in the horseracing operations of the purchasers, and under section 1231 (b) (1), he was property used in their trade or business when sold, because held for more than 6 months, and such application of the statute is not, in our opinion, dissipated or forestalled because they had in mind a later use which, under section 1231 (b) (3), would likewise qualify Darubini as property used in the trade or business of the owners for the purposes of section 1231 (a), if he should be held 12 months before being sold. In interpreting the statute for application here, a question which suggests itself is could capital gains treatment have been justifiably denied if the result of the sale had been a gain rather than a loss.

In most, if not all, of the cases cited, the question has been whether the animals sold had been held for breeding purposes or primarily for sale to customers in the ordinary course of the taxpayer's business. In *Robert B. Jewell*, 25 T.C. 109, the taxpayer, in the course of his business of raising and training harness horses for sale, did from time to time enter and race some of his horses for purses at public tracks. The question posed and decided, however, was whether or not the particular horses sold had been held by the taxpayer for breeding purposes, or primarily for sale to customers in the ordinary course of his business. On the facts, it was held that certain of the horses were held for breeding purposes and certain of the horses were held primarily for sale, and that as to others, the decision was against the taxpayer for failure of proof. There was no question as to whether any of the horses sold were held for racing purposes or for breeding purposes. Such a question would have been of no moment since under the statute then applicable the holding period was 6 months in either case. In *Estate of Ben H. Collings*, 138 F. Supp. 837, Collings was

**1134**

engaged in raising saddle or gaited horses for sale, and one of the activities in his business operations was that of entering and showing his horses in horse shows. There was no indication that profits were to be earned or derived from the winning of events in such shows, but rather, that the motive and purpose was to establish the quality of Collings' horses as fine saddle horses, to the end that he would realize profit on the raising, training, and selling of the horses produced in his breeding operations. None of the cases cited stands for the proposition for which petitioners here contend.

We conclude and hold that Darubini, having been acquired by petitioner and his associates for racing purposes in their horseracing operations and having been held and so used by them for more than 6 months, was property used by petitioners in their trade or business, and under section 1231(a), the loss sustained on his sale is to be considered as a capital loss.

*Decision will be entered for the respondent.*