Neil S. McCarthy and Marguerite G. McCarthy v. Commissioner.McCarthy v. CommissionerDocket No. 83264.United States Tax CourtT.C. Memo 1963-33; 1963 Tax Ct. Memo LEXIS 309; 22 T.C.M. (CCH) 129; T.C.M. (RIA) 63033; February 6, 1963Neil D. McCarthy, Esq., for the petitioners. Walter S. Weiss, Esq., and Lawrence S. Kartiganer, Esq., for the respondent. WITHEYMemorandum*310 Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in the income tax of petitioners for the years 1950, 1952, and 1953 as follows: YearDeficiency1950$ 4,568.44195278,670.121953101,972.96The issues presented for our decision are (1) whether the interest in the contract distributed to petitioner Neil S. McCarthy pursuant to a corporate liquidation had an ascertainable fair market value on April 14, 1952, and if so, what the fair market value thereof was at that date; (2) whether amounts received by the petitioner pursuant to the interest in the contract are taxable as ordinary income or capital gain in the years 1952 and 1953; (3) whether proceeds received from sales during 1950, 1952, and 1953 of certain horses owned by petitioner are taxable as ordinary income or capital gain under section 117(j) of the Internal Revenue Code of 1939; and (4) whether 39,500 shares of stock received by petitioner during 1953 pursuant to the sale of certain horses during that year had an ascertainable fair market value at the time of receipt, and if so, what the fair market value thereof was at that time. Additional issues presented by the*311 pleadings have been disposed of by concession of the parties. General Findings of Fact The stipulations of fact filed by the parties are incorporated herein as fact. Petitioners Neil S. and Marguerite G. McCarthy are husband and wife residing in Beverly Hills and Carmel, California, respectively. Petitioners are on the cash basis method of reporting income and filed joint income tax returns for the years 1950, 1952, and 1953 with the director at Los Angeles, California. Issues 1 and 2. Receipt of Interest in Motion Picture Contract Findings of Fact Cecil B. deMille Productions, Inc., sometimes hereinafter referred to as Productions, was organized in 1922 and thereafter until its liquidation engaged in the production of motion pictures. Productions had 8,000 shares of stock issued and outstanding on April 1, 1952, of which Neil S. McCarthy, sometimes hereinafter referred to as petitioner, owned 12.5 percent. His basis therein was $206,000. The names of the other shareholders of Productions and their respective interests were as follows: ShareholderPercentCecil B. deMille48,378Constance A. deMille10,4625Cecilia deMille Harper12.5Joseph W. Harper2.275Cecilia deMille Harper for -Cecilia deMille Calvin2.125Peter deMille Calvin1.95Joseph W. Harper, Jr.1.95Cecil B. deMille, trustee for -Cecilia deMille Calvin1.85Peter deMille Calvin2.2375Gladys Rosson, Cecilia deMilleHarper, and Joseph W. Har-per, trustees for -Richard deMille3.225Gladys Rosson.5375Russel Treacy.0125*312 In 1937, Productions entered into a contract with Paramount Pictures, Inc., sometimes hereinafter referred to as Paramount, according to which Productions agreed to produce and Paramount agreed to finance and distribute certain motion pictures. 1 Pursuant to this contract, Productions was to receive 50 percent of the aggregate net profits of all the motion pictures which it produced in accordance therewith, but the title to all such motion pictures was to pass to Paramount upon their completion by Productions. Productions, since the inception of the contract, produced 15 motion pictures and thereafter released them to Paramount, 13 of which had completed their "original run" release 2 and the other 2 were in the process of completing their "original run" release at the time Productions was liquidated. Each motion picture produced and conveyed to Paramount carried with it the right to "reruns," the television rights, and the copyright on its story content. Between September 1951 and April 1952 Productions attempted to sell its rights under the contract to various motion picture distributors but was*313 not successful. On April 14, 1952, Productions, upon resolution of its board of directors and approval of the shareholders, was liquidated, and all of its assets were distributed to its shareholders on a pro rata basis. Pursuant to the liquidation, there were distributed to petitioner real property and cash in the amount of $153,251.01 and an undivided one-eighth interest in the motion picture contract. The system for valuing motion pictures is well recognized by the movie industry, had been in use prior to April 14, 1952, by other major production companies, and has been found by the movie industry to be between 80 percent and 90 percent correct. This system involves projecting worldwide gross receipts from the distribution of the movies. 3 The fair market value of a motion picture or group thereof is usually between 65 percent and 75 percent of the total projected worldwide gross receipts therefrom, and the value of any contract rights in such movies is governed by the ultimate value of the motion pictures. Such projections of gross receipts from the worldwide*314 distribution of the 15 movies covered by the contract were taken from financial data and accounts maintained by Paramount at the time of the liquidation of Productions and the distribution of the contract to the shareholders, and were used by Paramount in collaboration with qualified experts to compute a fair merket value for the entire group of motion pictures in question in the amount of $3,512.500 as of April 14, 1952, the date of liquidation. This computation of fair market value includes all the rights appurtenant to the pictures including the reissue and television rights. *315 Petitioners on their joint income tax return for the year ended December 31, 1952, reported $206,000 as the basis of McCarthy's 1,000 shares of stock in Productions. Petitioners further reported as capital gain a total amount received in liquidation of Productions of $292,007.67 of which cash payments of $138,756.66 were received pursuant to the undivided one-eighth interest in the contract between Productions and Paramount. 4*316 On their joint income tax return for 1953, the petitioners reported as capital gain $168,389.76, which amount represented total payments received in 1953 pursuant to the one-eighth interest in the contract. Respondent in his notice of deficiency determined that the amounts received by petitioner, namely, $138,756.66 in 1952 and $168,389.76 in 1953 from his interest in the motion picture contract distributed in liquidation, constituted collection of a "claim or chose in action" and were thus taxable as ordinary income, respectively, in the years received. Ultimate Finding The fair market value of the contract in question was ascertainable, and that value was $3,512,500 as of April 14, 1952. Opinion The basic question presented is whether the interest in the motion picture contract distributed in liquidation constituted the collection of a "claim or chose in action" and is thus taxable to petitioner as ordinary income. The resolution of this issue depends upon whether the contract in question had an ascertainable fair market value as of April 14, 1952. Petitioner contends that the one-eighth interest in the contract he received in the liquidation of Productions in exchange*317 for his stock in that corporation had no ascertainable fair market value on the date of liquidation, that the transaction therefore remained open so that the subsequently received royalty payments, including $138,756.66 in 1952 and $168,389.76 in 1953, constituted part of the consideration received in exchange for the stock and are taxable as long-term capital gain. In support of their position, petitioners claim that the value of their contractual right to receive future income could not be ascertained at the time of the liquidation and distribution and, therefore, under Burnet v. Logan, 283 U.S. 404 (1931); Commissioner v. Carter, 170 F. 2d 911 C.A. 2, 1948), affirming 9 T.C. 364 (1947); and Westover v. Smith, 173 F. 2d 90 (C.A. 9, 1949), the transaction should not be recognized for tax purposes but should remain open so as to permit them to report all the future proceeds as capital gain in the years of realization. The respondent contends that the interest of Productions in the contract had an ascertainable fair market value as of the date of liquidation, April 14, 1952, and that the value thereof was $3,512,500, $439,062.50*318 of which represented the petitioner's interest. He further contends that any and all amounts to be received in future years or actually received by petitioner, including $138,756.66 in 1952 and $168,389.76 in 1953, pursuant to the contract, represent the collection of a claim or chose in action and are therefore taxable as ordinary income under section 22(a) of the 1939 Code. 5Pursuant to the terms of section 115(c) of the Code, amounts distributed in complete liquidation of a corporation are to be treated as in full payment in exchange for the stock. The amount of gain or loss from such a distribution is determined under section 111. Section 111 provides that the gain shall be the excess of the amount realized over the adjusted basis of the stock. The amount realized is defined as the sum of money received plus the fair market value of property received. Section 112 provides that the entire amount of the realized gain or loss determined under section 111 shall be recognized. The total realized and recognized gain (or loss) is taxable as capital gain (or loss) under section 117(a) of the Code since both petitioner*319 and respondent concede that the contract is a capital asset in the "hands" of petitioner. In exchange for his stock having a basis of $206,000 (which basis is not in controversy), petitioner received money and a building having a combined value of $153,251.01, plus an undivided one-eighth interest in all rights under the motion picture contract between Productions and Paramount. The problem of whether such a contract has an ascertainable fair market value has been the subject of extensive litigation over the years and has been resolved as a question of fact rather than one of law. Marsack's Estate v. Commissioner, 288 F. 2d 533 (C.A. 9, 1961). On the record before us we are convinced that the contract had an ascertainable fair market value as of April 14, 1952, the date of liquidation of the corporation. There is nothing inherent in a contract or claim for the future payment of indefinite amounts that causes it to be insusceptible of valuation at that time. The fair market values of such contracts were determined in Pat O'Brien, 25 T.C. 376 (1955); Boudreau v. Commissioner, 134 F. 2d 360 (C.A. 5, 1943), affirming 45 B.T.A. 390 (1941);*320 and John W. Chamberlin, 32 T.C. 1098 (1959), affd. 286 F. 2d 850 (C.A. 7, 1960), and although the task of valuing such a contract may be difficult, it is not insuperable; given all the relevant evidence from which values are usually determined, it is only in rare and extraordinary cases that property would have no reasonably ascertainable fair market value. John W. Chamberlin, supra. The only evidence we have in support of petitioners' claim that the right to receive profits under the contract had no ascertainable value in 1952 are the negotiations by Productions and three other distributor-producers wherein they declined to purchase Productions' interest in the contract. The inability to sell one's property right to a fragment of the available market does not conclusively establish an unascertainable fair market value. In this case petitioner has not shown that the parties to these negotiations ever attempted to compute a fair market value or that those to whom the contract interest was offered refused to purchase on the sole ground that they could not ascertain a market value. Moreover, petitioner has not demonstrated that he exhausted all*321 or any substantial portion of the possible buyers in attempting to sell his interest. On the other hand, sufficient evidence was offered by qualified experts to the effect that the fair market value of the movies covered by the contract was ascertainable as of any given date. By a systematic projection of world-wide gross receipts which the movies would produce and by taking a percentage of the total amount of those gross receipts, such experts were able to determine the ultimate fair market value thereof. They thus set the value of the involved movies between $3,200,000 and $3,800,000. This system had been fairly accurate and had been widely used in the motion picture industry to so calculate future receipts and net profits of various motion pictures, and in our opinion the method used is sound. Petitioners, contending as they do that the contract had no ascertainable fair market value, have not offered any evidence of a different fair market value from that determined by respondent and thus have failed to overcome the presumption of correctness of the respondent's determination. We have concluded in our Findings of Fact, therefore, that the entire contract in question had an ascertainable*322 fair market value of $3,512,500 with petitioner's resulting share therein totaling $439,062.50 as of April 14, 1952, and we further hold that the transaction was completed for tax purposes as of that date. It follows that the excess of such fair market value over that part of petitioner's basis in the stock allocated to the contract represents gain realized by him on liquidation of Productions and is recognized as capital gain for 1952 under section 117(a) of the Code. We further hold that $307,146.42 6 received by petitioner during 1952 and 1953 pursuant to his interest in the contract is in the nature of a recovery of the basis 7 in his interest in the contract and does not represent the realization of taxable income. Pat O'Brien, 25 T.C. 376 (1955). In Pat O'Brien, supra, the taxpayer received a fractional interest in a motion picture pursuant to a corporate liquidation. We held there that amounts received subsequent to the liquidation because of his interest in the movie were first to be treated as a recovery of his basis in the interest and only the excess being taxable as ordinary income. That result controls our determination here. *323 Issues 3 and 4. Racehorses Findings of Fact During the years in question, 1950, 1952, and 1953, petitioner owned and maintained a ranch in the Tierra Rajada Valley, Ventura County, California. The ranch had been used to an extent for growing crops and raising cattle but was primarily used for the raising and quartering of certain horses, among which were racehorses. It was the custom of petitioner, with respect to the horses, either to purchase them or breed them at the ranch, raise them until they were about 2 years old, and then train them for racing. During that period, it was possible for petitioner or his trainers to discover physical defects in the horses which would ultimately prevent them from attaining petitioner's standards of racing quality. If such defects were discovered during this time, the horses were culled and sold or held for a time and sold. The remaining horses were trained for racing, and any of these which were later discovered not to be of a "racing class" were also culled and sold. It was petitioner's practice to enter the then remaining horses in thoroughbred competition, and if any of these "had no speed or lacked competitive ability," they were*324 usually sold. Some of the petitioner's horses which were retained and raced ultimately earned sizable amounts of income in the form of "purses" at the various races in which they were entered. The usual pattern of operation of a person who bred and raised horses for sale, as opposed to one who raised them for racing, was that the former raised them as yearlings and sold them at yearling sales and did not usually train them for racing. Petitioner, however, never sold his horses at yearlings sales, usually held most of them beyond a period of 1 year, and attempted to train as many as possible. During 1950, petitioner sold six horses. The name, year raised, date of sale, holding period, track record, sales price, and gain realized from the sales of four of the horses in question are as follows: YearDateHoldingTrackSalesGainNameraisedof saleperiodrecordpricerealizedKeon (colt)19479-30-50over 3 yrs.none$ 500$ 500Acquiescence194710- 1-50over 3 yrs.1 race3,5003,500(filly)(5-15-50)Troy Chief (colt)194812-50over 2 yrs.5 races6,0006,000Chalon (colt)194911-50over 1 yr.none1,0001,000(nominated1 race)*325 The respondent determined that the gain on the sale of the four horses which had been raised by petitioner constituted ordinary income rather than capital gain as reported by petitioners on their 1950 joint income tax return. During 1952, petitioner sold 25 horses. Thirteen were sold in a single group in exchange for 18,800 shares of Canadian Oil & Gas Reserves, Ltd., stock. These shares had a total value of $23,500 ($1.24 per share) on the date of sale of the horses. Of the 13 horses sold, respondent determined that the gain realized from the sale of 9 constituted ordinary income rather than capital gain as reported by petitioners in their 1952 joint income tax return. The pertinent data with respect to these nine horses are as follows: YearDateHoldingNameraisedof saleperiodNevant19478-28-52over 5 yrs.Foal of Glidelight19528-28-52less than1 yr.Neva Kelp (colt)19518-28-52over 1 yr.Foal from Moon Eyes19528-28-52less than1 yr.Glidelight (mare)19438-28-52over 9 yrs.Yo Te Amo (filly)19498-28-52over 3 yrs.Moon Eyes19458-28-52over 7 yrs.Azu Linda19508-28-52over 2 yrs.Filly of Devil's Thumb19518-28-52over 1 yr.*326 TrackSalesGainNamerecordpricerealizedNevant1 race$1,807.69$1,807.69(3-24-49)Foal of Glidelightnone1,807.691,807.69Neva Kelp (colt)none1,807.691,807.69Foal from Moon Eyesnone1,807.691,807.69Glidelight (mare)broodmare1,807.691,807.69Yo Te Amo (filly)none (11,807.691,807.69nomination)Moon Eyesbroodmare1,807.691,807.69Azu Lindanone1,807.691,807.69Filly of Devil's Thumbnone1,807.691,807.69Of the remaining 12 horses sold in 1952, respondent determined that the gain realized from the sale of 9 of the 12 constituted ordinary income rather than capital gain as reported by petitioners in their 1952 income tax return. The pertinent statistics on the nine horses are as follows: YearDateHoldingTrackSalesGainNameraisedof saleperiodrecordpricerealizedDonato (colt)19504-522 yrs.1 race$2,500$2,500(2-26-52)Sierra Cal19505-522 yrs.none (11,0001,000nomination)Peranne19506-522 yrs.raced twice5,0005,000(filly)(1-52)Lady Mysticpurch.(filly)8-516-5210 mos.none5,0005,000Tafoya (filly)195011-52over 2 yrs.2 races615615Tranquilina195011-52over 2 yrs.none (12,8602,860(filly)nomination)Cinco Pesos195010-52over 2 yrs.2 races2,5002,500(colt)Filly from195011-52over 2 yrs.none393393FingerbelleBroval (filly)194710-52over 5 yrs.3 races1,0001,000(1949)*327 During the year 1953, petitioner sold 14 horses. 8 Ten horses were sold in a single group to J. R. Finlay of Canada in exchange for $10,000 in cash plus 39,500 shares of Canadian Oil & Gas Reserves, Ltd., stock. During the latter part of 1952 and 1953, the stock had a high bid price of $1.70 and a low bid price of $1.55. The respondent determined that the 39,500 shares had a fair market value of $51,350, or $1.30 per share, as of December 31, 1953, 9 and that the gain realized from the sale of 8 of the horses constituted ordinary income rather than capital gain. Petitioner, however, reported only $10,000 cash as received pursuant to the sale of the 10 horses and he treated the gain therefrom as capital gain. He did not include the fair market value of the 39,500 shares as part of the gain from the sale of this group of horses on the ground that the stock had no ascertainable fair market value. The pertinent statisties on these eight horses are as follows: YearDateHoldingTrackNameraisedof saleperiodrecordTrampolinaPurch. 8-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 mos.6 racesEncinas (colt)19516-18-53over 2 yrs.noneBribery (filly)19516-18-53over 2 yrs.noneHigh Justice (colt)19506-18-53over 3 yrs.4 races(1952)Colt from Sierra Nevada-Kelp19516-18-53over 2 yrs.noneBazada (filly)19516-18-53over 2 yrs.noneProba (colt)19516-18-53over 2 yrs.noneTerrazes (colt)19516-18-53over 2 yrs.none*328 As to the remaining four horses, or interests in horses, sold in 1953, petitioners on their 1953 joint income tax return reported the gain realized from the sales of those horses as short-term capital gain, whereas the respondent in his notice of deficiency determined the gain was ordinary income. The relevant information as to each of these horses is as follows: 10Net costDateDateHolding(afterSalesGainNameacquiredsoldperioddepreciation)pricerealizedTige O'My Heart6-539-533 mos.$7,338.75$10,000$2,661.25Cortil (1/2 of11-523-534 mos.975.011,00024.991/30th interest)Morning Wings7-537-53less than4,000.007,0003,000.001 mo.Filly from Queen of5-1-58 18-533 mos.3,782.313,782.31Karachi*329 Opinion The question presented is whether the proceeds from the sale of horses sold by petitioner during the taxable years in question qualified for capital gain treatment under section 117(j) as gain from the sale of assets used in a trade or business of a character subject to an allowance for depreciation or whether such proceeds were from assets which were held for sale to customers in the ordinary course of business and are taxable as ordinary income. Section 117(j) provides that the net gain from the sale of assets, held for more than 6 months, used in a trade or business, of a character subject to an allowance for depreciation, and which are not held for sale to customers in the ordinary course of business shall be taxable as capital gain. 11*330 Petitioner contends that he was in the business of raising, breeding, and purchasing horses for racing purposes and not in the business of raising horses for sale, that all the horses sold in 1950, 1952, and the group of 10 sold in 1953 were assets used in such trade or business which were subject to the allowance for depreciation, and accordingly the gain on the sales thereof should receive capital gain treatment under section 117(j). Respondent contends that while petitioner may have been in the business of racing horses, he was also engaged in the business of raising horses for sale. He argues, therefore, that the horses sold in 1950 and 1952 and 8 of the group of 10 horses sold in 1953 were assets held for sale to customers in the ordinary course of business and, therefore, the petitioner did not qualify for capital gain treatment under section 117(j) but that the resulting gain should be taxed as ordinary income. As to the remaining group of four horses sold in 1953, petitioner contends that the gain on their sale should be taxed as shortterm capital gain. With respect to these horses, respondent first contends that the gain realized from their sale was taxable as ordinary*331 income because they were held for sale to customers in the ordinary course of business. Respondent further argues that, regardless of whether the horses were held for sale to customers, the gain is still taxable as ordinary income because petitioner neither qualifies for capital gain treatment under section 117(j), in that the animals were not held for the requisite 6-month period, nor were the horses capital assets within the definition of section 117(a). Petitioner further contends that the 39,500 shares of stock in Canadian Oil & Gas Reserves, Ltd., received in the sale of horses in 1953 produced no taxable gain in 1953 because the shares had no ascertainable fair market value at that time. 12 Respondent contends, however, that the shares had an ascertainable value of $1.30 per share, or a total value of $51,530, and thus the transaction is taxable in 1953. In addition, respondent takes the position that the shares of stock were not subject to an escrow agreement. *332 Respondent relies on Robert B. Jewell, 25 T.C. 109 (1955), to support his contention that petitioner was engaged in the business of raising horses for sale. We stated in that case that the determination of the primary purpose for which the horses were held was a question of fact and that it was necessary to look to the intent of the taxpayer at the time of sale to make that determination. While we held in the Jewell case that the taxpayer's principal business there was selling animals and not raising them for racing, we found in arriving at that determination that the taxpayer did not train or race the horses to the extent petitioner herein did, did not call or sell an animal upon discovery of defect, sold most of his animals during their yearling year regardless of the existence or nonexistence of a defect, and we concluded that his purpose was to build a superior breeding stock to enhance the sale value of the horses. We think the Jewell case is distinguishable on its facts from the case in question and thus its ultimate holding as to the taxpayer is not controlling. We find the petitioner in this case has established that he is not in the business of selling horses*333 but is primarily engaged in the business of breeding and raising horses for the purpose of racing. This is borne out by the following factors: Petitioner did not sell his horses at yearling sales as is the custom of the "horse trader"; he sold his horses only upon discovery of a defect or after they proved to have no competitive ability for racing; he kept the majority of his horses beyond a year and attempted to train them for racing during their second year; he entered his horses in a number of races and was able to show a profit from his race winnings. The horses were not trained and raced as a part of a horse selling business but as a part of the integral, indivisible business of the petitioner of owning, training, racing, and breeding racehorses. We hold, therefore, that the 4 horses sold in 1950, the 18 horses sold in 1952, 13 and the 8 sold in 1953 were not held for sale to customers in the ordinary course of petitioner's business but were assets used in the trade or business of a character subject to an allowance for depreciation, and thus the proceeds realized from their sales for the respective years are taxable as long-term capital gain pursuant to section 117(j) of the*334 Code. Since the four horses sold by petitioner in 1953 were used by him in his horse racing business and were of a character which were subject to an allowance for depreciation, they do not constitute capital assets within the meaning of section 117(a). 14 Further, while we find that these horses were not held for sale to customers in the ordinary course of business, nevertheless, the gain realized from their sale does not qualify for capital gain treatment under section 117(j) as property used in a trade or business, of a character which is subject to an allowance for depreciation, held for more than 6 months, inasmuch as these horses were held for less than 5 months. Therefore, the gain realized by petitioner from the disposition of these four horses in 1953 does not qualify as short-term capital gain, and we must sustain the respondent's contention that it represents ordinary income. *335 With respect to the 39,500 shares of stock in Canadian Oil & Gas Reserves, Ltd., received by petitioner on the sale of the horses, we hold that such stock had a fair market value of $1.30 per share. Thus such value is part of the gain realized from the sale of the 10 horses in 1953. John W. Chamberlin, supra.Although petitioner contends that the stock was to be held in escrow for a year and thus had no ascertainable fair market value, no written escrow agreement was produced and petitioner could not recall its terms. Under such circumstances we cannot sustain petitioners' contentions as to the existence of such an agreement and it follows therefore that the value of such stock is recognized taxable gain for 1953. Decision will be entered under Rule 50. Footnotes1. This contract will sometimes hereinafter be referred to as the contract.↩2. The term "original run" refers to the original issue of the motion pictures as opposed to reissue or second run.↩3. All of the major motion picture distribution companies made projections of anticipated gross receipts as a necessary business practice to determine how much money they would have during the first year of distribution of the picture to finance the subsequent production of other motion pictures. The method of making projections of gross receipts is basically that of comparing the pattern of flow of the gross receipts of motion pictures where the original run has been substantially completed with whatever gross receipts have been recorded for the motion picture in question. The motion pictures used for such a comparison are those which constitute a cross section of various types of motion pictures having similar characteristics to the motion picture in question. The use of these comparisons establishes the pattern of flow of gross receipts for the particular picture in question and by projecting the established pattern of flow forward, the ultimate worldwide gross receipts are ascertainable.↩4. The following explanation for this treatment of this income was given by the petitioners in their 1952 joint income tax return: This corporation was liquidated and dissolved on April 14, 1952. Taxpayer received assets having a fair market value of $153,251.01. Taxpayer also received in liquidation an interest in certain contracts which had and have a very substantial value. However, owing to future business contingencies there is no way of ascertaining the full, fair market value of such contract; and since there is thus no ascertainable fair market value the taxpayer, instead of ascribing a value which subsequent events might disclose to be speculative in the sense of being too high or too low, is treating the transaction as remaining open until all payments received as a result of the liquidation are completed and accounted for, * * *↩5. All further references to the Code are to the 1939 Code.↩6. This total represents payments made by Paramount to petitioner in pursuance of the contract of $138,756.66 and $168,389.76 in 1952 and 1953, respectively. ↩7. Pursuant to section 113(a)(18) of the Code, the basis of property received in a corporate liquidation is the same as the basis of the stock redeemed in the liquidation, increased in the amount of gain recognized to the taxpayer.↩8. The stipulation of facts filed by the parties states that petitioner sold 13 horses in 1953, yet the exhibits appended to petitioners' joint income tax return for 1953 clearly show he sold 14 horses for that year. This discrepancy remains unexplained. ↩9. This value was computed by discounting the low bid price of the stock in 1953 of $1.55 per share due to the problem of selling a large block of stock at once.↩10. None of these horses, it will be noted, were held by the petitioner for more than 5 months prior to sale.↩1. On their 1953 income tax return petitioners inadvertently inserted "5-1-51" as date of acquisition of this horse. The correct date is 5-1-53. ↩11. SEC. 117. CAPITAL GAINS AND LOSSES. * * *(j) Gains and Losses from Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer, if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * * Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. * * * (2) General Rule. - If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversion, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *↩12. Petitioner contends that the 39,500 shares of stock were to be held in escrow for a year, beyond his control, and thus had no ascertainable fair market value. No written escrow agreement was produced and petitioner could not recall the terms of the alleged escrow agreement. If there was an escrow agreement, it is not clear from the record whether the stock became subject to an escrow after the sale of the horses and receipt of stock by petitioner or as a part of the sale.↩13. Two horses sold in 1952, Glidelight and Moon Eyes, were of a class known as broodmares which were used for breeding purposes. Such a class is specifically given capital gain treatment under section 117(j)↩.14. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include -. * * *(B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), or real property used in his trade or business;↩