382 F.2d 675
 Joan E. HELLER TRUST (formerly Joan E. Smotkin Trust), Arizona Trust Co., Trustee, Carole D. Smotkin Trust, Arizona Trust Co., Trustee, Robert M. Heller and Joan E. Heller, husband and wife, Harold J. Smotkin Trust, Arizona Trust Co., Trustee, and Edward E. Smotkin and Betty J. Smotkin, husband and wife, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 21185.
 United States Court of Appeals Ninth Circuit.
 August 24, 1967.
 
 Boyle, Bilby, Thompson & Shoenhair, David W. Richter, Tucson, Ariz., for petitioners.
 Mitchell Rogoven, Asst. Atty. Gen., Lee Jackson, David Walter, Marco Sonnenschein, Attys., Tax Division, Dept. of Justice, Lester R. Uretz, Chief Counsel, Internal Revenue Service, Washington, D. C., for respondent.
 
 
 1
 Before JERTBERG and MERRILL, Circuit Judges, and TAYLOR, District Judge.
 
 FRED M. TAYLOR, District Judge:
 
 2
 This proceeding involves a review of the decisions of the Tax Court as they affect the parties in the five consolidated cases below. Jurisdiction of this court has been invoked pursuant to Title 26 U.S.C.A. § 7482.
 
 
 3
 A review by this court is limited to the clearly erroneous test as proscribed by Rule 52(a) of the Federal Rules of Civil Procedure.
 
 
 4
 This case presents two questions, the first being whether the real estate involved, i. e., duplex houses, which were sold at a profit for and on behalf of the parties during the years in question should be taxable as ordinary income or on a capital gains basis, and second, whether the deferred payment contracts executed by purchasers of duplexes had a fair market value of 50 percent of face value and to that extent includable in petitioners' income in the year of sale. The Tax Court made a factual determination that the profit derived from the sales of the duplex houses in the years in question should be taxable as ordinary income for the reason that the property was held primarily for sale to customers in the ordinary course of business.[1]
 
 
 5
 The determination by the Tax Court that the property in question was held primarily for sale to customers in the ordinary course of business must rise or fall upon the interpretation the court below gave to the activities of petitioner Edward E. Smotkin (taxpayer). None of the petitioners argue otherwise.
 
 
 6
 The facts as found by the Tax Court may be summarized as follows:
 
 
 7
 In 1941, taxpayer and one Bromley, doing business as a partnership, engaged in the business of developing, building and selling real estate in Ohio. Subsequently, in 1941, Bromley left the business and taxpayer continued to operate it until the business terminated in 1944, at which time taxpayer retired and moved to California because of his wife's health. He entered the photo-finishing business in California, but subsequently, in 1948, he terminated that business and moved to Tucson, Arizona. In that year, taxpayer formed a partnership with Bromley and Jay Smotkin (taxpayer's brother) under the name of American Homes Association. Jay Smotkin was bought out in 1949, after which taxpayer had a two-thirds interest and Bromley a one-third interest in the business.
 
 
 8
 In February of 1948, the partnership purchased an 80-acre tract of land near Tucson, Arizona, and by the latter part of 1949 or early 1950 the partnership had purchased two adjacent 80-acre tracts of land. During the period from 1948 to June 30, 1951, the partnership built and sold approximately 500 dwelling houses on two of the 80-acre tracts. During the period from July to November of 1951, taxpayer and Bromley incorporated American Homes Association (Association), and American Building Company, the taxpayer holding a two-thirds interest and Bromley a one-third interest in these corporations and in six rental corporations. In the last half of 1951, the National Realty Company, which held legal title to the third 80-acre tract for the benefit of taxpayer and Bromley, conveyed the legal title to the six rental corporations, the stock in which was issued one-third to taxpayer, one-third to Bromley, and one-third to Bromley as Trustee for taxpayer's children. (In April of 1952 the Arizona Trust Company replaced Bromley as Trustee in the Trust created by taxpayer and his wife for their children.)
 
 
 9
 Construction of the duplexes began in 1951 and by 1952, 194 had been built on the third 80-acre tract by the American Building Company. (Said company was liquidated in January of 1953). On January 2, 1952, a management agreement was executed by the Association and the six rental corporations under which the Association agreed to manage the duplexes owned by the rental companies, to act as rental and operating agent and collect rentals, to advertise the properties for rental and to maintain and repair the properties. The Association was remunerated for the services provided under this agreement on a commission basis in relation to gross rentals.
 
 
 10
 During 1953, the occupancy rate of the duplexes was about 65 percent, while during the years 1954 and 1955 the occupancy rate was about 75 percent. The financial statements of the rental corporations during the period 1953 through 1955 show consistent losses. During the first three and one-half months the duplexes were rented pursuant to written leases. Thereafter, they were rented on an oral month-to-month basis.
 
 
 11
 In an attempt to alleviate the problem of low tenant occupancy, taxpayer proposed early in 1954 that a swimming pool be constructed and that 120 of the units be furnished. Bromley was unwilling to make these changes, which would cost approximately $120,000.00 and on February 24, 1954, taxpayer and Bromley agreed to a division and distribution of their various property interests. Thereafter, the ownership in the six rental corporations and in the Association was as follows: taxpayer, one-third; taxpayer's wife, one-third; and the Trust Company as Trustee for the children, one-third. In 1954, the Association constructed the swimming pool and purchased furniture for some of the rental units.
 
 
 12
 During 1955, taxpayer's health caused him to obtain medical services and advice on numerous occasions. The Tax Court, however, found as a fact that some of these physical ailments were in existence as early as 1952 and 1953.
 
 
 13
 On September 1, 1955, the six rental corporations were liquidated and 186 duplexes were distributed to the stockholders in liquidation. (The other eight duplexes had been sold between June 1, and August 31, 1955). The Association served as selling agent for the stockholders and proceeded as rapidly as possible to sell the duplexes. Taxpayer was president of the Association during the years here in issue. Commencing on or about November 1, 1955, the duplexes were advertised for sale. Prior to that the duplexes were advertised only for rent. The Association employed extensive newspaper and radio advertising as part of its selling efforts. The Association moved its office to one of the duplexes, opened a model duplex for display, employed a staff of salesmen to handle the sales and prepared and distributed sales brochures to customers. At the time of the sale of each duplex it was completely reconditioned and redecorated by the Association. In addition, the Association paid for the closing costs incurred in selling the duplexes. In 1956 taxpayer obtained a real estate broker's license as a designated broker for the Association. Such license had been renewed annually up to the time the Tax Court heard this case. Also, it was shown that taxpayer was a member of the National Board of Realtors and the Tucson Real Estate Board. (It was further established at the trial of this cause below that even after the sales of all of the duplexes, the years which are in question here, taxpayer remained active in the general real estate business.)
 
 
 14
 During the period 1955 to 1958, 169 duplexes were sold. The remaining 17 duplexes were exchanged in 1956 for ranch property. In a typical sale, the purchaser would finance the sale by tendering a cash down payment and by executing a mortgage and also a contract in favor of petitioners for the payment of the balance. As part of the sales package, the Association also offered the free use of the pool for a temporary period to a purchaser of a duplex and his tenant. The books and records of the Association show that owners and tenants of the duplexes were not charged for pool services until May 1, 1958. The Association also furnished other fringe services to be provided by it which need not be considered at this juncture.
 
 
 15
 Petitioners reported the gains realized from the sale of the duplexes during the years in question as long-term capital gains. In addition, petitioners considered the contracts received from the purchasers of the duplexes as having no ascertainable fair market value, and, accordingly, reported the payments on the contracts as income only in the year in which the payments exceeded their adjusted cost basis.
 
 
 16
 Petitioners maintain that the duplexes were sold because of taxpayer's deteriorating health and also because the duplex rental operation was a business failure. The petitioners also argue, with some logic, that because these factors prompted the sale of the property, which was being held primarily for rental purposes, the sale was in fact a liquidation of investment property. Petitioners contend that under the decision of Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102, it is clearly demonstrated in the record that the property was acquired and held "primarily" for an investment purpose. In Malat it is stated:
 
 
 17
 "The purpose of the statutory provision with which we deal is to differentiate between the `profits and losses arising from the everyday operation of a business' on the one hand (Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29) and `the realization of appreciation in value accrued over a substantial period of time' on the other. (Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S.Ct. 1497, 1500, 4 L.Ed.2d 1617.) A literal reading of the statute is consistent with this legislative purpose. We hold that as used in § 1221(1), `primarily' means `of first importance' or `principally.'"
 
 
 18
 The Tax Court rendered its decision on two theories,[2] the first of which was that at the time the duplex venture began, the taxpayer was merely continuing the business of holding property for resale or rental, whichever proved the more profitable, that is to say, that the property was held for a dual purpose. However, subsequent to the Malat decision, supra, which was on appeal when the Tax Court rendered its opinion, the Tax Court rendered a Supplemental Memorandum wherein it set out the fact that taxpayer held the property primarily for sale as "primarily" was defined in that opinion.
 
 
 19
 This court cannot agree with the opinion of the Tax Court insofar as it concludes from the facts that the taxpayer was continuing his business of holding property primarily for sale when he caused the duplexes to be built. We are convinced from the record that when taxpayer caused the duplexes to be built and began to rent them he was beginning an entirely new business venture, that of investment in rental property, quite apart from his previous building for sale activities. It is our opinion that the Tax Court was clearly erroneous in determining that the duplex operation was a continuance of taxpayer's business of buying and selling houses and developing real estate for sale, there being no competent evidence in the record to justify such a conclusion.
 
 
 20
 The Tax Court further determined that taxpayer was holding the duplexes primarily for sale to customers in the ordinary course of his business from late 1955 and thereafter during the years that are in question here. The petitioners maintain that such a determination is erroneous.
 
 
 21
 Petitioners argue that the investment property was being liquidated by means of a series of sales and so long as the purpose for selling was liquidation, they should be afforded capital gains treatment on the profits. They maintain that anything may be done to further the liquidation and that if the first sales were interpreted to be in furtherance of a liquidation of property held primarily for investment, all the remaining sales would be insulated so as to afford capital gains treatment.
 
 
 22
 Under the Tax Court's decisions on this second theory, that is, that the duplexes were held after late 1955 for sale to customers in the ordinary course of taxpayer's business, it would have been impossible for these petitioners to liquidate their interests without having the proceeds therefrom taxed as ordinary income. We do not believe that such a harsh treatment is warranted under the applicable law and the facts of this case. Clearly, up until shortly before the time of the first sales, taxpayer's primary purpose for holding the property was one of investment. If the Tax Court's theory is to be followed, the court cannot conceive how persons with an investment such as we have here could bring themselves within the purview of the capital gains provisions of the statute where, as here, they had to abandon a disappointing investment by means of a series of sales.
 
 
 23
 It is apparent that the Tax Court's second theory is to the effect that once the sales began the taxpayer began to engage in a business. However, where the facts clearly demonstrate that a taxpayer held certain property as an investment, and further show that this purpose continued until shortly before the time of a sale, and that the sale is prompted by a liquidation intent, the taxpayer should not lose the benefits provided for by the capital gain provisions. Municipal Bond Corporation v. C. I. R., 341 F.2d 683 (8 Cir. 1965). While the Tax Court made findings that would seem to negate the liquidation intent on the part of taxpayer, i. e., his health was poor when he began to build the duplexes and that the duplex rental market was not very favorable when the business venture began, we think that these findings do not have a competent and justifiable basis in the record and are therefore clearly erroneous.
 
 
 24
 It is well settled that a case such as the one here must be decided on its own facts. In light of Malat, supra, we believe that under the facts of this case the only justifiable finding is that the duplex properties were acquired and held prior to sale primarily for rental purposes and not for sale. We hold that under the facts of this case petitioners should be entitled to receive capital gain treatment for the profits derived from the sales of the duplex properties.
 
 
 25
 We next consider whether the Tax Court was clearly erroneous in holding that the deferred payment contracts executed by purchasers of the duplexes had a fair market value of 50 percent of face value and to that extent includable in petitioners' income in the year of sale. It is admitted that petitioners were on a cash basis.
 
 
 26
 The Internal Revenue Code of 1954, 26 U.S.C.A. § 1001, provides:
 
 
 27
 "(a) Computation of gain or loss. — The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis * * *.
 
 
 28
 "(b) Amount realized — The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received."
 
 
 29
 Most of the duplexes were sold at prices ranging from about $15,000 to $16,200. A typical sale was financed by the purchaser making a cash payment, assuming an FHA mortgage and executing a purchase contract for the remaining balance payable in monthly installments with the remaining balance becoming due in five years. Petitioners treated these contracts as having no ascertainable fair market value and reported the payments on the contracts as income in the year in which the payments exceeded the adjusted cost basis. The Commissioner and the Tax Court determined that each contract had a market value of 50 percent of its face value in the year in which the sale was made. Petitioners contend that these contracts could not have had an ascertainable fair market value in the particular year received because they did not receive any negotiable instruments as evidence of any indebtedness, i. e., notes and mortgages. This court has heretofore made the observation that such a distinction in some cases appears to be illusory. Phillips v. Frank, 295 F.2d 629 (9 Cir. 1961).[3] Although it appears from the record that the evidence is meager, we believe that it was enough for the trial court to find that the contracts did have an ascertainable fair market value when received.
 
 
 30
 Petitioners further contend that there were certain obligations such as upkeep of the swimming pool, free rental and garbage service, which prevented the contracts from having a fair market value. The Tax Court found that these obligations were assumed by the Association, a separate corporation, and that they were not obligations that would destroy the marketability of the contracts in question. We agree.
 
 
 31
 It is our opinion that Section 1001, supra, required the petitioners to include as income the fair market value of the contracts in the year received. We are also of the opinion that there is sufficient evidence in the record to support the Tax Court's determination of fair market value and that such determination was not clearly erroneous.
 
 
 32
 The decisions of the Tax Court are reversed and remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Internal Revenue Code of 1954, 26 U.S. C.A. § 1221:
 "For purposes of this subtitle, the term `capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include —
 "(1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;"
 
 
 [2]
 Supplemental Memorandum, pp. 3-4: "When we say in our opinion that petitioner intended at the outset to either rent or sell these houses, whichever proved more profitable, we are talking of a taxpayer whose primary business was developing and selling houses and who was about to try renting some of its houses, and if renting proved unprofitable, then it would be abandoned as a business endeavor and the houses like the other 500 houses it built and sold to customers, would be held primarily for sale to customers in the ordinary course of its business. We think the houses in question were being held after late 1955 for sale to customers in furtherance of the primary business purpose of petitioner, which was that of developing real estate and selling houses."
 
 
 [3]
 Although that distinction was formerly accepted by the Tax Court in cases cited by petitioners, it has since been rejected. Perelman v. Commissioner, 41 T.C. 234 (1963); Hubert Kaufman, Tax Ct.Mem. 1964-127