LAUNCE E. GAMBLE AND JOAN L. GAMBLE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1617–76. Filed August 30, 1977.

*Alice Welt Cunningham* and *Jerry H. Robinson,* for the petitioners.

*James H. Ross, Jr.,* for the respondent.

RAUM, *Judge:* The Commissioner determined a deficiency of $62,256.60 in petitioners' 1971 income tax. At issue are first, whether petitioners realized ordinary income or capital gain from the sale of a yearling colt, and second, the proper cost basis of the colt.

### FINDINGS OF FACT

The parties have filed a stipulation of facts and a supplemental stipulation of facts, both of which, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners Launce E. Gamble and Joan L. Gamble, husband and wife, timely filed a joint Federal income tax

return for 1971. At the time they filed their petition herein they resided in San Francisco, Calif. Launce E. Gamble will sometimes hereinafter be referred to as petitioner.

Mr. Gamble's principal occupation consists of seeking out investment opportunities and managing his assets. He owns stocks, bonds, real estate, farming interests, mining interests, oil and gas operations, and cattle ranches. From 1964 through 1974, in addition to the interests described above, he was also engaged in the business of racing thoroughbred horses. During that period, he acquired full or partial ownership of a total of 13 horses for business or investment purposes.[1] However, because from time to time he sold certain of the horses which he owned (and also because one of his horses died), he never owned—in whole or in part—more than five horses at any one time.

Mr. Gamble entered the thoroughbred racing business on February 1, 1964, when for $10,000 he purchased Tasty, a broodmare then pregnant with a foal sired by the stud Seaneen. Tasty was considered to have been placed in service in Mr. Gamble's business immediately upon her purchase, and she was held for use in his business until she was sold on November 1, 1966. Mr. Gamble received net proceeds of $6,522.58 from her sale.

He purchased his first interest in a stud when on October 17, 1964, he bought a 1/32d interest in New Policy. He sold this interest shortly afterwards, on March 19, 1965, for a net selling price of $6,500.

While owned by Mr. Gamble, Tasty gave birth to three foals, including the one she had been carrying when she was purchased. Relevant information concerning these foals appears in the following table:

| Name | Type | Date of birth | Date sold | Age when sold | Net selling price |
|---|---|---|---|---|---|
| Tasty/Seaneen (Tasty Charger).. | Colt | 3/31/64 | 10/22/65 | 18 months, 22 days | $2,937 |

---

[1] Mr. Gamble also owned "pleasure" horses which were held neither for investment nor for business purposes and which have nothing to do with this case. These pleasure horses were kept either at Golden Gate Park in San Francisco or on properties in the Napa Valley owned by petitioner's family.

| | | | | | |
|---|---|---|---|---|---|
| Tasty/Noor (Love Potion)....... | Filly | 3/13/65 | 7/17/66 | 16 months, 4 days | $3,494 |
| Tasty/Pleiades 2d (Miss Pleiades).... | Filly | 2/7/66 | 7/16/67 | 17 months, 9 days | 4,074 |

The record does not reveal whether any of Tasty's foals was ever trained for racing while owned by Mr. Gamble. However, as a general rule, the training of a horse for racing does not begin until 18 months after birth. And, as appears from the preceding table, each of the three foals was sold when it was approximately 18 months of age or slightly younger. Moreover, the record does establish that none of these foals was actually raced while it was owned by Mr. Gamble. Notwithstanding this apparent lack of direct involvement of these horses in actual racing, the parties have stipulated that each of Tasty's foals is "properly characterized as having been used in the Petitioner's * * * business."

Each of these three foals was sold at a "secondary" California yearling sale. None of them was considered to be of a high enough quality to have been accepted either at one of the two premier national thoroughbred sales (i.e., Keeneland and Saratoga), or even at the "select" California sale.

The record does not disclose the manner in which Mr. Gamble computed for Federal income tax purposes his gain from the sale of any of these foals. It does reveal, however, that in 1967 he reported $4,074 as long-term capital gain from the sale of a thoroughbred filly identified as "Tasty's Yearling," which was apparently Tasty/Pleiades 2d (Miss Pleiades).

On the basis of his experience with Tasty's three foals, Mr. Gamble determined that Tasty would not produce successful race horses, so he decided to replace her with a broodmare of higher quality. Thus, at the same sale at which Tasty was sold, he purchased a new broodmare, named "Pie Queen," for use in his business. When purchased, Pie Queen was carrying a foal sired by My Host.

While owned by Mr. Gamble, Pie Queen gave birth only to the foal she had been carrying at the time of her purchase. She died on February 1, 1969, in the process of giving birth to

her next expected foal. Relevant information concerning the Pie Queen/My Host foal appears below:

| Name | Type | Date of birth | Date sold | Age when sold | Net selling price |
|---|---|---|---|---|---|
| Pie Queen/ My Host (Bellemente)........ | Filly | 3/12/67 | 8/18/68 | 17 months, 6 days | $23,744.50 |

As had been done with Tasty's three foals, the Pie Queen/My Host filly was sold just as she reached the age at which she would have been expected to have begun training for racing and before she was actually raced at a public track. Nevertheless, the parties have stipulated that this horse also is "properly characterized as having been used in the Petitioner's * * * business."

In computing for Federal income tax purposes his gain from the sale of this foal, Mr. Gamble deducted $2,000 as its cost basis; this amount was determined by an allocation of a portion of the total cost paid for Pie Queen pregnant with the foal. The portion so allocated was based upon the stud fee of the foal's sire, My Host.[2] In reporting the gain from the sale of this animal, Mr. Gamble's 1968 tax return indicated that the filly had been "acquired" in "Mar., 1967" which date reflected her birth rather than the date on which Pie Queen had been purchased.

Subsequent to Pie Queen's death, Mr. Gamble and his "agent" studied the catalogue of the annual fall mixed sale at Keeneland, Ky, with a view towards obtaining another broodmare suitable for use in Mr. Gamble's horse racing business. One of the broodmares listed in the catalogue was Champagne Woman. In addition to a description of Champagne Woman's pedigree, racing record, and past production record, the catalogue indicated that Champagne Woman was believed to be carrying a foal sired by Raise A Native.

Upon studying this catalogue, Mr. Gamble recognized the fine qualities of, and the value inherent in, Champagne Woman in her expectant state. Not only did she herself have

---

[2] It cannot be determined from the record whether any stud fee was in fact paid either by Mr. Gamble or Pie Queen's former owner.

an impressive record, but also, Raise A Native was known as a particularly successful stud. His offspring included 17 stakes winners, among them Majestic Prince, winner of both the Kentucky Derby and the Preakness Stakes. In 1969 the 19 yearlings sired by Raise A Native sold for a total of $935,000, or an average price of $49,211 per horse. Over the course of his lifetime, a total of 41 Raise A Native yearlings have been sold for an average price of $50,256.

Prior to November 10, 1969, Mr. Gamble did not know the exact amount of Raise A Native's stud fee, although he believed that it was rather high. Subsequent to that date, he ascertained that in 1969 the stud fee for a mare's service by Raise A Native was $27,500 for a shareholder (an owner of an interest in the stud horse), and between $32,500 and $35,000 for a nonshareholder.

Mr. Gamble and his agent both expected that Champagne Woman would sell for a price in excess of $100,000; in fact, they thought that the auction might begin with bids of $100,000 or more. Therefore, because Mr. Gamble had decided that he wanted to purchase a broodmare costing no more than approximately $50,000, Champagne Woman was not included among the horses for which Mr. Gamble's agent was supposed to bid.

However, notwithstanding the considerations referred to above, Champagne Woman was purchased for Mr. Gamble's account on November 10, 1969, at the Keeneland sale, for only $60,000.[3] She was acquired for use in his horse racing business, and was placed in service in that business immediately upon her purchase.

To ensure that Champagne Woman was in foal, Mr. Gamble's agent had the horse examined by a veterinarian prior to completing the purchase. If that examination had revealed that she was not in foal, Mr. Gamble would have had the right to reject the horse, and he would not have been

---

[3] The record is somewhat unclear as to precisely how this purchase came about. For instance, the evidence does not reveal whether petitioner or his agent made the decision to purchase Champagne Woman at that price. Nor does it satisfactorily explain why the horse sold for a price so much lower than expected. According to petitioner's testimony the "bargain" price resulted from the fact that the seller (a foundation) did not "support" the price of the horse at the sale. However, even if this were so, it does not explain why competing prospective purchasers did not drive the price up to anywhere near the levels which petitioner had anticipated.

obligated to pay the purchase price. In this case, the results of the examination were important for two distinct reasons. First of all, the mare had been bred to a known producing stud, and she was supposed to be in foal. If it were determined that in fact she was not expecting, suspicions that she was not fertile would have arisen. A barren broodmare would not have been suitable for Mr. Gamble's purposes. And secondly, Mr. Gamble realized that apart from any possible question of Champagne Woman's fertility in general, the specific foal which she was then supposed to be carrying would be a particularly valuable animal.

On November 10, 1969, Mr. Gamble purchased "Live Foal Insurance" covering the expected foal of Champagne Woman. The insurance protected him against loss because of the death of the foal at any time from that date until 30 days after foaling. The benefit payable under this policy was $20,000 and the premium for this coverage was $3,600. The "Cover Note" which, pending issuance of a formal policy, served as a temporary contract of insurance stated in respect of the expected foal:

> * * * If Purchased, give Purchase Price and
> Date of Sale $20,000, 11/10/69 * * *

At about the same time, Mr. Gamble purchased "Full Mortality Insurance" in the amount of $60,000, covering Champagne Woman for the period from November 11, 1969, through November 10, 1970. The cover note issued in connection with this insurance policy—although referred to in the covering letter of Exhibit 4–D—was not submitted in evidence.

On December 20, 1969, Mr. Gamble acquired a ¼ interest in Deck Hand, the second stud horse used in connection with his business. Then sometime in January 1970, he acquired an additional 1/12 interest in the animal, thus becoming a 1/3 owner. Mr. Gamble still owned his interest in Deck Hand at the time of the trial herein.

The Champagne Woman/Raise A Native foal, whose eventual sale gave rise to the amounts now in controversy, was born on April 12, 1970. The foal was a chestnut colt, and will sometimes hereinafter be referred to by that description.

Five days after the foal's birth, Mr. Gamble purchased "Full Mortality Insurance" in the amount of $30,000 covering the foal from May 12, 1970, through May 11, 1971.

Champagne Woman and her colt were boarded at the Loma Rica Ranch. At least some, if not all, of the other thoroughbreds which Mr. Gamble held for use in his business were also kept there. The Loma Rica Ranch is an independently owned boarding ranch for horses held for all purposes. It provides the following services for a fee: boarding, training, sales preparation, blacksmithing, veterinary, and shipping. Until the colt was weaned, at about the age of 6 months, it was necessary that he be stabled with his mother. After that, Mr. Gamble continued to board him at Loma Rica because there he would be given the special care and attention he required.

In computing his Federal income taxes for the years during which he owned the colt, Mr. Gamble deducted, as current expenses of his thoroughbred racing business, the costs of boarding the colt at Loma Rica Ranch.

During the time it was owned by Mr. Gamble, the colt was neither trained for racing nor actually raced at a public track. At the same time, however, the colt was handled in a manner entirely consistent with a plan to train and race it when it reached the proper age.[4]

As the colt approached the age at which it would normally have begun training for racing, Mr. Gamble entered it in the Saratoga Yearling Sale, held August 10–13, 1971, at Saratoga, N.Y. Under the conditions of this auction, an owner who offered his horse for sale had the right to bid for the animal; if his was the last bid, he would retain ownership by paying merely a 5-percent sales commission on the last bid price. Thus, when he offered the colt for sale in this manner, Mr. Gamble risked comparatively little and was able to determine whether he should sell the animal then and thus avoid completely the risks of actually racing, or whether he should go forward in a racing campaign. Moreover, a certain amount of attention had focused on this particular colt because its elder siblings were doing well in short races, and by offering

---

[4] See p. 802.

the colt for sale at this time Mr. Gamble hoped to capitalize on this interest.

The colt was in fact sold on the first night of the Saratoga sale for a price of $125,000.[5] By comparison, the average price of the 52 horses sold there that night was $22,754.

In computing for Federal income tax purposes his gain upon the sale of the colt, Mr. Gamble subtracted from the $125,000 gross proceeds of the sale, selling expenses of $12,500 and, in addition, $30,000 as the cost basis of the colt. This basis was derived from the allocation of a portion of the $60,000 purchase price which had been paid to acquire Champagne Woman carrying the colt as a foal. The portion allocated to the foal was determined by reference to Raise A Native's stud fee at the time he sired the foal.

In addition to the colt which is the primary focus of this case, Champagne Woman gave birth to three other foals while she was owned by Mr. Gamble. Each of these foals was used in his thoroughbred racing business. Certain relevant information concerning these three foals appears below:

| Name | Type | Date of birth | Date sold | Age when sold | Net selling price |
|---|---|---|---|---|---|
| Champagne Woman/ Promised Land (Promised Woman) | Filly | 3/22/71 | 11/1/74 | 3 years, 7 months, 10 days | $8,800 |
| Champagne Woman/ Deck Hand (Deck Stewardess) | Filly | 3/20/72 | 11/1/74 | 2 years, 7 months, 12 days | 7,241 |
| Champagne Woman/ Prince John | Filly | 2/21/74 | 8/1/74 | 5 months, 11 days | 12,000 |

---

[5] The record does not reveal whether Mr. Gamble or his agent made the final decision to sell the colt at this price, nor does it indicate whether that decision was made in advance of or during the sale.

Promised Woman and Deck Stewardess were the only two horses which were actually raced while owned by Mr. Gamble. Neither horse was particularly successful. Out of the seven races in which Promised Woman was entered, she never won, placed second only once, and earned a total of $374. Deck Stewardess ran slowly in her only race and did not win anything.

Mr. Gamble sold Champagne Woman on August 1, 1974 (at the same time as he sold her newest foal Champagne Woman/Prince John), for a net selling price of $60,000.

In computing for Federal income tax purposes the income or loss generated by his horse racing business, Mr. Gamble claimed deductions for depreciation in respect of some but not all of the horses used in the business. Insofar as the record reveals, deductions for depreciation were claimed as follows:

| Name of horse | Status | Basis | Year | Amount |
|---|---|---|---|---|
| Pie Queen | Broodmare | $24,000 | Prior to 1967 | $6,000.00 |
| | | | 1967 | 9,000.00 |
| | | | 1968 | 4,125.00 |
| Champagne Woman | Broodmare | 30,000 | Prior to 1971 | 3,951.21 |
| | | | 1971 | 3,386.75 |
| Deck Hand | Stud | [1]14,000 | Prior to 1971 | 1,921.87 |
| | | | 1971 | 1,812.50 |

[1] Total basis of all partial interests.

The parties have stipulated that no deduction for depreciation was claimed in respect of the Champagne Woman/Raise A Native colt at issue herein. In addition it appears from the record that no such deduction was claimed in respect of the Pie Queen/My Host filly.

Whether depreciation deductions were claimed in respect of any of Mr. Gamble's other business horses cannot be determined from the record.

As was stated above, in computing his gain upon the sale of the colt in issue, Mr. Gamble subtracted from the sales price of $125,000 selling expenses of $12,500 and a cost basis of $30,000; moreover, he characterized the reported gain of $82,500 as long-term capital gain.

In his notice of deficiency, the Commissioner determined that—

the sale of the colt resulted in ordinary income in that the colt was not a capital asset nor did it qualify for section 1231(b)(3) treatment since the colt was not born until April 1970 and therefore was not held for 24 months prior to sale. In addition, the basis of the colt was zero in that $30,000 of a purchase price of $60,000 for Champagne Woman, a broodmare in foal at purchase date November 1969, was erroneously allocated to the unborn foal.

## OPINION

1. *Did petitioner realize ordinary income or capital gain from the sale of the chestnut colt?* The character of petitioner's gain from the sale of his colt is governed, inter alia, by sections 1221 and 1231, I.R.C. 1954. Relevant portions of these provisions are set forth in the margin.[6]

---

[6] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If, during the taxable year, the recognized gains on sales * * * of property used in the trade or business * * * exceed the recognized losses from such sales * * * such gains * * * shall be considered as gains * * * from sales or exchanges of capital assets held for more than 6 months. * * *

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months * * * which is not—

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *
* * *

(3) LIVESTOCK.—Such term includes—

(A) cattle and horses, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 24 months or more from the date of acquisition, and

(B) other livestock, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 12 months or more from the date of acquisition.

Such term does not include poultry.

The foregoing provisions of sec. 1231(b)(3) were included in the Code by sec. 212(b) of

Section 1221 defines as capital assets all property held by the taxpayer except for certain specified categories of property. The exceptions pertinent to this case exclude from the definition of capital assets, (a) property which is held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business (sec. 1221(1)), and (b) property, used in a taxpayer's trade or business, of a character which is subject to the allowance for depreciation (sec. 1221(2)). Although we have concluded on the evidence before us, contrary to the Government's position, that the colt here in question was not held primarily for sale to customers, we have also concluded, contrary to petitioner's principal contention, that it was depreciable property used in petitioner's business. It was thus by definition not a capital asset (sec. 1221(2)), and we must therefore consider whether petitioner is nevertheless entitled to have the gain on sale treated as capital gain by reason of section 1231. We hold for petitioner.

Section 1231(a) provides, in essence, for capital gain treatment of gains realized from the sale of certain property of the type described in section 1221(2), notwithstanding that the property is, by definition, not a capital asset. But, the section 1231(a) alternative route to capital gain treatment applies only to some of the property described in section 1221(2); the conditions specified by section 1231(b) define which property is covered by section 1231(a). Moreover, the rules of section 1231(b) which deal specifically with livestock were substantially revised by section 212(b) of the Tax Reform Act of 1969, 83 Stat. 487, 571, and the parties disagree as to whether the old or the new version of the statute governs this case. We have concluded, however, on the basis of the record before us, that petitioner's ownership of the colt satisfied the applicable requirements of *both* the old and the new versions of the statute. We therefore hold that whichever version of section 1231(b) governs, petitioner realized capital gain from the sale of the colt pursuant to section 1231(a).

the Tax Reform Act of 1969 and were made effective in respect of "livestock acquired after December 31, 1969." The provisions of sec. 1231(b)(3) in effect prior thereto read as follows:

(3) LIVESTOCK.—Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry.

*a.* We consider first section 1221, and in particular section 1221(1) and (2). The parties have adopted diametrically opposed positions on this point: while petitioner contends that the colt was held purely as an investment so that neither provision bars the colt from classification as a capital asset, the Commissioner, on the other hand, asserts that the colt fell into either one or the other of the two exclusions. Resolution of this essentially factual dispute requires a detailed and comprehensive analysis of all the circumstances of petitioner's relevant business activities and his ownership of the colt[7] so that his true intentions may be determined.[8]

The parties have stipulated that "Petitioner was engaged in * * * the business of racing thoroughbred horses," and also that each of the other horses involved in this case is "properly characterized as having been used in the Petitioner's * * * business." Viewed in light of this stipulation, the record before us cannot sustain either a finding that petitioner was engaged in a business of selling horses to customers, or that the chestnut colt was held *primarily* for sale in the course of such a business. Cf. *Heller Trust v. Commissioner,* 382 F.2d 675, 680 (9th Cir.), affirming in part, reversing in part, and remanding a Memorandum Opinion of this Court. To be sure, petitioner had sold the four foals which he had raised prior to the chestnut colt, but at least three of those sales appear on this record to have involved culls. And previous cases involving similar sales of livestock establish that such sales may properly be regarded as merely an incidental—if perhaps normal—part of the taxpayer's business of raising the animals for another purpose. *Kirk v. Commissioner,* 47 T.C. 177, 191; *Jewell v. Commissioner,* 25 T. C. 109; *McDonald v. Commissioner,* 23 T. C. 1091. In this case, the stipulation of facts resolves any doubts we may have had concerning the

[7] See, e.g., *Rockwell v. Commissioner,* 512 F.2d 882, 884 (9th Cir.), affirming a Memorandum Opinion of this Court, certiorari denied 423 U.S. 1015; *Los Angeles Extension Co. v. United States,* 315 F.2d 1, 3 (9th Cir.); *Kelley v. Commissioner,* 281 F.2d 527, 528 (9th Cir.), affirming a Memorandum Opinion of this Court; *United States v. O'Neill,* 211 F.2d 701, 702 (9th Cir.); *Adam v. Commissioner,* 60 T.C. 996, 999; *Brown v. Commissioner,* 54 T.C. 1475, 1487, affirmed 448 F.2d 514 (10th Cir.); *Bynum v. Commissioner,* 46 T.C. 295, 299.

[8] *Kirk v. Commissioner,* 47 T.C. 177, 191; *Jewell v. Commissioner,* 25 T.C. 109, 115; *McDonald v. Commissioner,* 23 T.C. 1091, 1099, which followed *McDonald v. Commissioner,* 214 T.C. 341 (2d Cir.), reversing 17 T.C. 210.

nature of petitioner's business—it was "racing thoroughbred horses." And while that business encompassed holding horses which were sold before they were ever actually raced, such sales were not of such character or frequency as to constitute an activity that qualified as a business in which horses were held for sale to customers. Moreover, as to the chestnut colt here in controversy, petitioner's testimony has established to our satisfaction that he was holding the colt in order to exploit it through whatever course of action might appear at the time to be most profitable, either through sale, or to race it himself, or in some other manner (e.g., by syndication). No one such purpose appeared to predominate over another. In short, we cannot find that petitioner was holding the colt *principally* for sale. As a consequence of this factual conclusion we have no alternative but to hold, as required by *Malat v. Riddell*, 383 U.S. 569, 572, that petitioner was not holding the colt "primarily" for sale to customers within the meaning of section 1221(1).

However, the same factors which led to that conclusion also compel the finding that the colt was depreciable property used in petitioner's business within the meaning of section 1221(2). Given the nature of petitioner's business—which as was stated above, *encompassed* holding immature foals for possible future use as race horses (cf. *McDonald v. Commissioner*, 214 F.2d 341, 344)—the evidence indicates unmistakably that the colt was acquired, held, and sold in connection with that business. Moreover, it seems clear that the colt was "property * * * of a character * * * subject to the allowance for depreciation." Sec. 1.167(a)–6(b), Income Tax Regs.; *Kirk v. Commissioner, supra* at 188.

First of all, the colt was obtained in the same manner that petitioner had obtained other such foals in the past—its dam was purchased when she was pregnant with the foal. When the second broodmare used in petitioner's business (Pie Queen) died, petitioner decided to replace her with a broodmare of higher quality. To acquire such a replacement he sent his agent to the Keeneland auction looking for a broodmare in foal in the $50,000 price range. And in fact he acquired just such an animal, Champagne Woman in foal to Raise A Native, although the price was 20-percent higher than he had expected to pay. Considering the unpredictability

inherent in the price of any purchase to be made at an auction, neither this $10,000 difference nor the fact that petitioner had not expected that he would be able to afford Champagne Woman provides any substantial support for petitioner's contention that Champagne Woman in foal was not the sort of animal which he would have purchased in the normal course of his business.

Once the colt was born it was handled just as were petitioner's other business horses. Not only was it stabled at Loma Rica Ranch, but more significantly, the expenses of boarding it there were deducted as current expenses of petitioner's business. Petitioner's assertion that the expenses were deducted rather than capitalized because of the mistake of his accountants is unconvincing. Cf. *Brown v. Commissioner*, 54 T.C. 1475, 1488, affirmed 448 F.2d 514 (10th Cir.); *Clark v. United States*, 27 T.C. 1006, 1013. Moreover, while no deduction for depreciation was taken in respect of the chestnut colt, neither was any such deduction claimed in respect of the Pie Queen/My Host foal, and there is no evidence in the record as to whether a deduction for depreciation was claimed in respect of any of the other foals born in the course of petitioner's business. Compare *Estate of Smith v. Commissioner*, 23 T.C. 690, 707, and *Fawn Lake Ranch Co. v. Commissioner*, 12 T.C. 1139, 1143.

Petitioner's relationship to the chestnut colt ended when he sold the animal at an auction as a yearling. We have accepted the contention that this sale reflected only a marginal choice among a number of possible alternatives, rather than the realization of his one dominant and overriding intention. But notwithstanding that conclusion, the fact remains that petitioner disposed of this colt in exactly the same way that he had disposed of the four foals which he had owned previously.

In sum, the record before us provides no substantial basis for distinguishing petitioner's ownership of the chestnut colt from his ownership of his other thoroughbred foals. We have therefore concluded that the chestnut colt must similarly be characterized as property used in petitioner's business.

*b.* Since the colt was excluded from capital asset status by section 1221(2), the question which remains is whether section 1231(a) nevertheless provides for capital gain treatment of the profit realized from its sale. Section 1231(b)(1) defines

generally what property produces gain subject to section 1231(a),[9] and section 1231(b)(3) provides some specific rules for this purpose dealing with livestock.

Section 1231(b)(3), as it read prior to its amendment in 1969,[10] was derived verbatim from section 324 of the Revenue Act of 1951, Pub. L. 183, 65 Stat. 452, 501, which amended then section 117(j)(1), I.R.C. 1939. The legislative history of the provision reveals that it was—

not intended to change the present application of section 117(j) of the code to race horses in any situation in which such race horses fall within the term "property used in the trade or business." [H. Rept. 1213 (Conf. Rept.), 82d Cong., 1st Sess. 78.]

Thus, gain from the sale of a horse held for racing purposes would qualify for section 1231(a) treatment if the horse was depreciable property used in the taxpayer's trade or business within the meaning of section 1231(b)(1), notwithstanding the fact that it was not held for one of the purposes specified in section 1231(b)(3). *Kirk v. Commissioner*, 47 T.C. at 187–188; *Fowler v. Commissioner*, 37 T.C. 1124, 1131. The general definition of section 1231(b)(1) also covered animals held for business uses other than racing or the three uses specified in subsection (b)(3), such as, for example, riding horses held for rental by a stable. *Campbell v. Commissioner*, T.C. Memo. 1961–166, 20 T.C.M. 825, 855–856, 30 P-H Memo. par. 61,166, pp. 61–934—61–935(1961). Animals subject only to the general rule of section 1231(b)(1) needed to be held by the taxpayer for only 6 months rather than 1 year. *Fowler v. Commissioner, supra.*

By 1969 Congress had become aware of certain problems which it felt were related to the relatively short holding periods required by section 1231(b)(1) and (3) in connection with livestock.[11] To deal with these problems Congress

---

[9] While the general definition of sec. 1231(b)(1) is limited by three specific exclusions, sec. 1231(b)(1)(A), (B), and (C), only (B) appears to be of potential relevance here. However, our decision that the colt was not sec. 1221(1) property means in effect that it was not sec. 1231(b)(1)(B) property either, since, insofar as they are pertinent to this case, those two provisions have the same meaning. *Hollywood Baseball Assoc. v. Commissioner*, 423 F.2d 494, 497 (9th Cir.), affirming 49 T.C. 338, certiorari denied 400 U.S. 848; *International Shoe Machine Corp. v. United States*, 491 F.2d 157, 159 (1st Cir.), certiorari denied 419 U.S. 834.

[10] See p. 809 n. 6.

[11] See S. Rept. 91–552, pp. 100–101, 1969–3 C.B. 423, 488; H. Rept. 91–413 (Part 1),

enacted section 212(b) of the Tax Reform Act of 1969, 83 Stat. 487, 571, which amended section 1231(b)(3) as follows:

SEC. 212. LIVESTOCK.

(b) LIVESTOCK USED IN TRADE OR BUSINESS.—

(1) AMENDMENT OF SECTION 1231.—Section 1231(b)(3) (relating to property used in a trade or business) is amended to read as follows:

"(3) LIVESTOCK.—Such term includes—

(A) cattle and horses, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 24 months or more from the date of acquisition, and

(B) other livestock, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 12 months or more from the date of acquisition.

Such term does not include poultry."

(2) EFFECTIVE DATE.—The amendments made by paragraph (1) shall apply to livestock acquired after December 31, 1969.

The Commissioner argues that the taxation of petitioner's gain from the sale of the chestnut colt is governed by the amended version of section 1231. According to the Government's theory, livestock cannot be section 1231 property under the new statute unless the conditions of the new section 1231(b)(3) are satisfied. Thus the Government asserts that in making the changes which it did in 1969, Congress not only intended to add the category of "sporting purposes" to those business uses of livestock which require a longer than 6 month holding period, but also intended to exclude completely from the benefits of section 1231 livestock held for any business purpose besides the four uses enumerated in section 1231(b)(3). And so—the argument concludes—because the colt was not held for any of the four purposes[12] specified therein or for the time required, it was not section 1231 property.

Petitioner contends, in the first place, that the preamendment statute is controlling and that the colt plainly qualified as section 1231 property under the law in effect before 1970. Alternatively, petitioner claims that if the amended statute is applicable, the colt nevertheless qualifies as section 1231 property under the general definition provided in section

---

p. 70, 1969-3 C.B. 200, 244.

[12] As will appear *infra*, the Commissioner surprisingly agrees with petitioner's position that the colt was not held for "sporting" purposes.

1231(b)(1) notwithstanding the fact that it failed to satisfy the conditions of section 1231(b)(3)(A).

We decline to resolve the fascinating and difficult— but here immaterial—question of whether for purposes of the effective date section of the 1969 Act (sec. 212(b)(2)) petitioner "acquired" the colt on November 10, 1969 (when he purchased Champagne Woman with the foal en ventre sa mere), so that the preamendment statute governs, or on April 12, 1970 (when the foal was born), so that the amended statute is controlling.[13] We hold that petitioner's profit was capital gain no matter which version of the statute is applicable.

As was stated previously, there is no doubt that under the statute in effect until 1970, an animal which was held for use in the taxpayer's business, but not for one of the three purposes specified in section 1231(b)(3) would qualify as a section 1231 asset if it was held for more than 6 months. *Kirk v. Commissioner*, supra at 187–188; *Fowler v. Commissioner*, supra at 1131; *Campbell v. Commissioner*, 20 T.C.M. at 855–856, 30 P-H Memo. T.C. par. 61,166, pp. 61–934—61–935 (1961); H. Rept. 1213, 82d Cong., 1st Sess. 78. Thus, at least from the time they were added to section 117(j)(1) of the 1939 Code by section 324 of the Revenue Act of 1951 until the enactment of the Tax Reform Act of 1969, the rules contained in section 1231(b)(3) served—as Congress intended they should—in effect primarily[14] to outline a safe harbor rather

---

[13] Nor do we decide whether any portion of an animal's life in utero may be included in the computation of its holding period to meet the 24-month minimum required by sec. 1231(b)(3)(A), or the other periods required by other parts of sec. 1231(b). And so the parties' dispute over whether what petitioner acquired on Nov. 10, 1969, was "an interest in the foal contingent upon the condition precedent that it reach full term and be born alive" or was instead a present interest in the foal subject to "possible defeasance * * * by the occurrence of a condition subsequent," is largely irrelevant. We do note, however, that at least two cases involving the pre-1970 statute have decided that the sec. 1231 holding period of an animal does not begin before its birth. *Greer v. United States*, 408 F.2d 631, 635–636 (6th Cir.); *Meisgeier v. Commissioner*, T.C. Memo. 1970–351, 29 T.C.M. 1700, 39 P-H Memo. T.C. par. 70, 351 (1970). And, moreover, to the extent that the required holding period for cattle and horses was lengthened by the 1969 Act to insure that the purpose for which an animal was being held would be determined on the basis of more objective evidence (see S. Rept. 91–552, *supra*, 1969–3 C.B. at 488; H. Rept. 91–413, *supra*, 1969–3 C.B. at 244), that goal of the legislation would be substantially frustrated by the inclusion of the prenatal period in the computation.

[14] Sec. 1231(b)(3), however, did restrict the availability of sec. 1231 treatment in two respects: one, by extending the required holding period to 12 months, and two, by excluding poultry from sec. 1231. Cf. *Magee v. Commissioner*, 17 T.C. 1583, 1587–1588.

than to delimit the exclusive passageway in respect of the benefits of section 1231(a). See S. Rept. 781, 82d Cong., 1st Sess. 41–42. Here, we have determined that the chestnut colt was depreciable property used in petitioner's business and that it was not held primarily for sale to customers. (See pp. 811–814 *supra*.) Moreover, the parties have agreed that it was not held for "draft, breeding, or dairy purposes." And simple computation reveals that it was held for more than 6 months. Therefore, if the preamendment statute is applicable, the colt was section 1231 property, and petitioner's income from its sale was capital gain.

The analysis of the colt's status under the post-1969 statute is not quite so simple. We must begin, however, with the fact that the parties are in agreement that the colt was not held for draft, breeding, dairy, *or sporting* purposes. While petitioner's position on this point is entirely consistent with the other contentions which he has advanced in this case, the Government's concession that the colt was not held for sporting purposes appears to us at least superficially difficult to reconcile with its position concerning the applicability of section 1221(2). Nevertheless, the Government states on brief:

> The colt herein was never raced nor was it trained for racing prior to its sale. Accordingly, even though it was used in petitioner's trade or business, it did not qualify as livestock held for sporting purposes under section 1231(b)(3). Treas. Reg. §1.1231–2(c).[15]

Thus, since the Government has conceded that section 1231(b)(3) is inapplicable, the record before us at this point presents a single question: Did the 1969 amendments to section 1231(b)(3) change the relationship of that section to section 1231(b)(1) so as to make section 1231(b)(3) the exclusive means by which livestock may qualify as section 1231 property? The statutory language, the logic behind it, and the legislative history of the 1969 amendments all suggest that the answer is "no."

---

[15] Sec. 1.1231–2(c)(1)(iii), Income Tax Regs., provides:

(iii) A horse which has neither been raced at a public track nor trained for racing shall not, *except in rare and unusual circumstances*, be considered as held for racing purposes. (Emphasis supplied.)

Neither party suggests the presence of any "rare and unusual" circumstances here.

In the first place, section 1231(b)(3) provides with respect to the term "property used in the trade or business" that "such term *includes*" (emphasis added) horses held for the four purposes specified. And, when the term "includes" is used in a definition in the Internal Revenue Code, it "shall not be deemed to exclude other things otherwise within the meaning of the term defined." Sec. 7701(b). Moreover, except for the addition of the category "sporting purposes" to the three categories previously enumerated in section 1231(b)(3), the language of the statute was left unchanged— insofar as it is material to the point now in issue—by the 1969 amendments. And there was no question that prior to the 1969 Act, animals held for purposes other than those specified in section 1231(b)(3) could qualify as section 1231 property so long as they satisfied the general definition of "property used in the trade or business" of section 1231(b)(1).

Secondly, the interpretation of the statute urged by the Government would lead to the exclusion from the benefits of section 1231 of animals which plainly would fall within the common understanding of the term "property used in the trade or business." Petitioner has persuasively suggested examples such as animals used for advertising or promotional purposes and those which have appeared in the movies or on television. Cf. O'Byrne, Farm Income Tax Manual, sec. 330, p. 190 (1977 rev.). And in a pre-1969 case, the Commissioner apparently agreed that horses held for rental by a riding stable were property used in the taxpayer's trade or business. *Campbell v. Commissioner,* 20 T.C.M. at 855–856, 30 P-H Memo. T.C. par. 61, 166, pp. 61–934—61–935 (1961). See also, 3B Mertens, Law of Federal Income Taxation, sec. 22.130, p. 894 (1973 rev.). While we do not prejudge the applicability of section 1231 to these or any other situations, the examples cited do suggest to us that the four uses specifically enumerated in section 1231(b)(3) represent only some but not all of the ways in which animals could be property used in a taxpayer's business.

Finally, we consider the legislative history of the 1969 amendments. The Government focuses upon a single sentence of the Senate Finance Committee report,[16] and on the basis of

---

[16] The sentence on which the Government rests its case reads as follows (S. Rept.

that sentence argues that the 1969 amendments changed completely the treatment of livestock by section 1231. However, we think that taken as a whole, the legislative history of the 1969 amendments indicates a much more limited congressional purpose.

While the sentence to which the Government points does, to some extent, suggest that after the 1969 amendments became effective only horses which were *both* (1) held for one of the four specified purposes and (2) held for 24 months, could qualify for section 1231 treatment, other sentences in the committee reports imply just as strongly that the 1969 changes were designed merely to require a 24-month holding period, *if* the horse was held for one of the four designated purposes.[17] This latter interpretation of the amendments is consistent with both the historical background of section 1231(b)(3) and also the overall purpose of the changes made in 1969.

Section 1231(b)(3) was originally introduced into the Code as the congressional effort to codify several court decisions which had interpreted the predecessor of section 1231(b)(1) as including within its scope animals which were used in the taxpayer's trade or business.[18] This codification was undertaken in response to what Congress viewed as an unwarranted attempt by the IRS to limit the availability of capital gains treatment under the predecessor of section 1231.[19] Ever since

---

91–552, *supra,* 1969–3 C.B. at 488):

Thus, cattle and horses are not to qualify for long-term capital gains treatment unless the animal is held by the taxpayer for at least two years for one of the specified purposes. * * *

[17] Thus the Senate Finance Committee report states in the sentence immediately preceding the one upon which the Government relies (S. Rept. 91–552, *supra,* 1969–3 C.B. at 488):

"the committee amendments extend the present one-year holding period for cattle and horses, *which* are held for draft, breeding, dairy or sporting purposes, to two years. [Emphasis added.]"

And the Conference Committee Report interpreted the Senate amendment, which was adopted, as follows (H. Rept. 91–782, p. 298, 1969–3 C.B. 644, 656):

"The Senate amendment provides that in order for any gain on the sale of horses or cattle to result in capital gain *where* the animals are held for draft, dairy, breeding, or sporting purposes, the horses or cattle must have been held for at least two years. [Emphasis added.]"

[18] *Albright v. United States,* 173 F.2d 339 (8th Cir.); *United States v. Bennett,* 186 F.2d 407 (5th Cir.).

[19] S. Rept. No. 781, 82d Cong., 1st Sess. 41–42.

then, section 1231(b)(3) has been understood as a provision which made the availability of capital gains treatment more certain, rather than as a provision designed to limit access to such treatment.[20]

To be sure, Congress in 1969 did decide to limit the availability of capital gains treatment through section 1231(b)(3) in order to prevent certain abuses. However, as the Committee reports indicate, the abuses were related to the length of time for which animals were required to be held.[21] And to remedy these problems, Congress increased the length of the holding period in certain situations. It did so in two steps: First, the holding period for horses and cattle held for one of the purposes specified in section 1231(b)(3) was increased from 12 to 24 months, and second, animals held for sporting purposes were included among those to which the lengthened holding period applied. By these actions, Congress effectively increased from 6 to 24 months the holding period required for a race horse if its sale was to produce capital gain under section 1231.

But that is as far as the statute goes. We can see no persuasive indication of a congressional intent to restrict capital gain treatment upon the sale of animals used in a taxpayer's business to those held for one of the four purposes listed in section 1231(b)(3). Nor do we see a compelling reason why it should be so limited. We recognize that the regulations as they now exist (see n.15 *supra*) might in some cases effectively shield from the 24-month holding period requirement horses which arguably should be subjected to it. However, that problem is not presented in this case, because the Government has taken the position that the chestnut colt was property used in petitioner's trade or business and that it was *not* held for sporting purposes. Therefore, even if the amendments made to section 1231 by the Tax Reform Act of 1969 are applicable here, petitioner realized capital gain from the sale of the colt by virtue of section 1231(b)(1).

2. *What was the basis of the colt?* Petitioner paid $60,000 to acquire Champagne Woman in foal to Raise A Native. To the extent that a portion of this purchase price was in fact paid to

---

[20] With certain exceptions, see p. 816 n. 14.

[21] See p. 814 n. 11.

acquire the unborn foal, that amount became petitioner's cost basis in the foal. Sec. 1012, I.R.C. 1954; cf. *Metz v. United States,* an unreported case (E.D. Ky. 1962, 10 AFTR 2d 5443, 62–1 USTC par. 9500).

We are fully convinced by the record as a whole that petitioner did pay more for Champagne Woman in foal to Raise A Native than he would have paid to acquire her "open" or in foal to a lesser known stallion. And, although the record was not entirely satisfactory in this respect, it is our best judgment that $20,000 of the purchase price was properly attributable to the unborn foal. First of all, the insurance policy which petitioner obtained to cover the unborn foal indicated that its purchase price had been $20,000. We regard this as far more reliable evidence of petitioner's estimate of how much he had paid for the foal than was his testimony at trial. Secondly, while stud fees actually paid by a taxpayer for the breeding of one of his mares might be the proper cost basis of the foal which was thus conceived (assuming the fee was not deducted as a current expense), it does not follow from that, that when a taxpayer purchases a mare in foal from the owner who has had it serviced by a stallion, the purchase price includes a dollar-for-dollar payment of the stud fee. Therefore, the stud fees actually charged by Raise A Native are only evidence of how much petitioner paid for the unborn foal. And to the extent that petitioner bought the whole package at a bargain price, we think at least part of the discount must be associated with the unborn foal. However, it would be wholly unrealistic to apply the entire bargain element first against the purchase price of the unborn foal so as to reduce its cost to zero, and therefore to conclude that it was acquired at no extra charge.

We do not accept the Government's contention that the foal had no cost basis whatever, nor do we approve the petitioner's position that a cost basis of $30,000 must be allocated to the foal. It is our best judgment on the record that a cost basis of $20,000 must be allocated to the foal and we so find.

*Decision will be entered under Rule 155.*